# UNITED STATES *v.* ASH

No. 71–1255.  Argued January 10, 1973—Decided June 21, 1973

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed an opinion concurring in the judgment, *post*, p. 321. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post*, p. 326.

*Edward R. Korman* argued the cause for the United States.  With him on the brief were *Solicitor General Griswold, Assistant Attorney General Petersen,* and *Jerome M. Feit.*

*Sherman L. Cohn,* by appointment of the Court, 408 U. S. 942, argued the cause and filed a brief for respondent.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

In this case the Court is called upon to decide whether

the Sixth Amendment [1] grants an accused the right to have counsel present whenever the Government conducts a post-indictment photographic display, containing a picture of the accused, for the purpose of allowing a witness to attempt an identification of the offender. The United States Court of Appeals for the District of Columbia Circuit, sitting en banc, held, by a 5-to-4 vote, that the accused possesses this right to counsel. 149 U. S. App. D. C. 1, 461 F. 2d 92 (1972). The court's holding is inconsistent with decisions of the courts of appeals of nine other circuits.[2] We granted certiorari

---

[1] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

[2] *United States* v. *Bennett,* 409 F. 2d 888, 898–900 (CA2), cert. denied *sub nom. Haywood* v. *United States,* 396 U. S. 852 (1969); *United States ex rel. Reed* v. *Anderson,* 461 F. 2d 739 (CA3 1972) (en banc); *United States* v. *Collins,* 416 F. 2d 696 (CA4 1969), cert. denied, 396 U. S. 1025 (1970); *United States* v. *Ballard,* 423 F. 2d 127 (CA5 1970); *United States* v. *Serio,* 440 F. 2d 827, 829–830 (CA6 1971); *United States* v. *Robinson,* 406 F. 2d 64, 67 (CA7), cert. denied, 395 U. S. 926 (1969); *United States* v. *Long,* 449 F. 2d 288, 301–302 (CA8 1971), cert. denied, 405 U. S. 974 (1972); *Allen* v. *Rhay,* 431 F. 2d 1160, 1166–1167 (CA9 1970); *McGee* v. *United States,* 402 F. 2d 434, 436 (CA10 1968), cert. denied, 394 U. S. 908 (1969). The en banc decision of the Third Circuit in *Anderson* overruled in part a panel decision in *United States* v. *Zeiler,* 427 F. 2d 1305 (CA3 1970).

The question has also produced conflicting decisions in state courts. The majority view, as in the courts of appeals, rejects the claimed right to counsel. See, *e. g., McGhee* v. *State,* 48 Ala. App. 330, 264 So. 2d 560 (Ala. Crim. App. 1972); *State* v. *Yehling,* 108 Ariz. 323, 498 P. 2d 145 (1972); *People* v. *Lawrence,* 4 Cal. 3d 273, 481 P. 2d 212 (1971), cert. denied, 407 U. S. 909 (1972); *Reed* v. *State,* —— Del. ——, 281 A. 2d 142 (1971); *People* v. *Holiday,* 47 Ill. 2d 300, 265 N. E. 2d 634 (1970); *Baldwin* v. *State,* 5 Md. App. 22, 245 A. 2d 98 (1968) (dicta); *Commonwealth* v. *Ross,* —— Mass. ——, 282 N. E. 2d 70 (1972), vacated on other grounds and remanded, 410 U. S. 901 (1973); *Stevenson* v. *State,* 244 So. 2d 30 (Miss. 1971); *State* v. *Brookins,* 468 S. W. 2d 42 (Mo. 1971) (dicta); *People* v. *Coles,* 34 App. Div. 2d 1051, 312 N. Y. S. 2d 621 (1970) (dicta); *State* v.

to resolve the conflict and to decide this important constitutional question. 407 U. S. 909 (1972). We reverse and remand.

I

On the morning of August 26, 1965, a man with a stocking mask entered a bank in Washington, D. C., and began waving a pistol. He ordered an employee to hang up the telephone and instructed all others present not to move. Seconds later a second man, also wearing a stocking mask, entered the bank, scooped up money from tellers' drawers into a bag, and left. The gunman followed, and both men escaped through an alley. The robbery lasted three or four minutes.

A Government informer, Clarence McFarland, told authorities that he had discussed the robbery with Charles J. Ash, Jr., the respondent here. Acting on this information, an FBI agent, in February 1966, showed five black-and-white mug shots of Negro males of generally the same age, height, and weight, one of which was of Ash, to four witnesses. All four made uncertain identifications of Ash's picture. At this time Ash was not in custody and had not been charged. On April 1, 1966, an indictment was returned charging Ash and a codefendant, John L. Bailey, in five counts related to this

---

*Moss,* 187 Neb. 391, 191 N. W. 2d 543 (1971); *Drewry* v. *Commonwealth,* 213 Va. 186, 191 S. E. 2d 178 (1972); *State* v. *Nettles,* 81 Wash. 2d 205, 500 P. 2d 752 (1972); *Kain* v. *State,* 48 Wis. 2d 212, 179 N. W. 2d 777 (1970). Cf. *State* v. *Accor,* 277 N. C. 65, 175 S. E. 2d 583 (1970). Several state courts, however, have granted a right to counsel at photographic identifications. See, *e. g., Cox* v. *State,* 219 So. 2d 762 (Fla. App. 1969) (video tapes); *People* v. *Anderson,* 389 Mich. 155, 205 N. W. 2d 461 (1973); *Thompson* v. *State,* 85 Nev. 134, 451 P. 2d 704, cert. denied, 396 U. S. 893 (1969); *Commonwealth* v. *Whiting,* 439 Pa. 205, 266 A. 2d 738, cert. denied, 400 U. S. 919 (1970).

bank robbery, in violation of D. C. Code Ann. § 22–2901 and 18 U. S. C. § 2113 (a).

Trial was finally set for May 1968, almost three years after the crime. In preparing for trial, the prosecutor decided to use a photographic display to determine whether the witnesses he planned to call would be able to make in-court identifications. Shortly before the trial, an FBI agent and the prosecutor showed five color photographs to the four witnesses who previously had tentatively identified the black-and-white photograph of Ash. Three of the witnesses selected the picture of Ash, but one was unable to make any selection. None of the witnesses selected the picture of Bailey which was in the group. This post-indictment [3] identification provides the basis for respondent Ash's claim that he was denied the right to counsel at a "critical stage" of the prosecution.

No motion for severance was made, and Ash and Bailey were tried jointly. The trial judge held a hearing on the suggestive nature of the pretrial photographic displays.[4] The judge did not make a clear ruling on suggestive nature, but held that the Government had demonstrated by "clear and convincing" evidence that in-court identifications would be "based on observation of

---

[3] Respondent Ash does not assert a right to counsel at the black-and-white photographic display in February 1966 because he recognizes that *Kirby* v. *Illinois*, 406 U. S. 682 (1972), forecloses application of the Sixth Amendment to events before the initiation of adversary criminal proceedings. Tr. of Oral Arg. 21–22; Brief for Respondent 32 n. 21.

[4] At this hearing both the black-and-white and color photographs were introduced as exhibits. App. 44. The FBI agents who conducted the pretrial displays were called as witnesses and were cross-examined fully. App. 10, 28. Two of the four witnesses who were expected to make in-court identifications also testified and were cross-examined concerning the photographic identifications. App. 55, 65.

the suspect other than the intervening observation." App. 63–64.

At trial, the three witnesses who had been inside the bank identified Ash as the gunman, but they were unwilling to state that they were certain of their identifications. None of these made an in-court identification of Bailey. The fourth witness, who had been in a car outside the bank and who had seen the fleeing robbers after they had removed their masks, made positive in-court identifications of both Ash and Bailey. Bailey's counsel then sought to impeach this in-court identification by calling the FBI agent who had shown the color photographs to the witnesses immediately before trial. Bailey's counsel demonstrated that the witness who had identified Bailey in court had failed to identify a color photograph of Bailey. During the course of the examination, Bailey's counsel also, before the jury, brought out the fact that this witness had selected another man as one of the robbers. At this point the prosecutor became concerned that the jury might believe that the witness had selected a third person when, in fact, the witness had selected a photograph of Ash. After a conference at the bench, the trial judge ruled that all five color photographs would be admitted into evidence. The Court of Appeals held that this constituted the introduction of a post-indictment identification at the prosecutor's request and over the objection of defense counsel.[5]

---

[5] The majority of the Court of Appeals concluded that Ash's counsel properly had preserved his objection to introduction of the photographs. 149 U. S. App. D. C., at 6 n. 6, 461 F. 2d, at 97 n. 6. Although the contrary view of the dissenting judges has been noted here by the Government, the majority's ruling on this issue is not asserted by the Government as a basis for reversal. Pet. for Cert. 4 n. 5; Brief for United States 6 n. 6. Under these circumstances, we are not inclined to disturb the ruling of the Court of Appeals on this close procedural question. App. 104, 126–131.

McFarland testified as a Government witness. He said he had discussed plans for the robbery with Ash before the event and, later, had discussed the results of the robbery with Ash in the presence of Bailey. McFarland was shown to possess an extensive criminal record and a history as an informer.

The jury convicted Ash on all counts. It was unable to reach a verdict on the charges against Bailey, and his motion for acquittal was granted. Ash received concurrent sentences on the several counts, the two longest being 80 months to 12 years.

The five-member majority of the Court of Appeals held that Ash's right to counsel, guaranteed by the Sixth Amendment, was violated when his attorney was not given the opportunity to be present at the photographic displays conducted in May 1968 before the trial. The majority relied on this Court's lineup cases, *United States* v. *Wade,* 388 U. S. 218 (1967), and *Gilbert* v. *California,* 388 U. S. 263 (1967), and on *Stovall* v. *Denno,* 388 U. S. 293 (1967).

The majority did not reach the issue of suggestiveness; their opinion implies, however, that they would order a remand for additional findings by the District Court. 149 U. S. App. D. C., at 7, 461 F. 2d, at 98. The majority refrained from deciding whether the in-court identifications could have independent bases, *id.,* at 14–15 and nn. 20, 21, 461 F. 2d, at 105–106 and nn. 20, 21, but expressed doubt that the identifications at the trial had independent origins.

Dissenting opinions, joined by four judges, disagreed with the decision of the majority that the photographic identification was a "critical stage" requiring counsel, and criticized the majority's suggestion that the in-court identifications were tainted by defects in the photographic identifications. *Id.,* at 14–43, 461 F. 2d, at 106–134.

## II

The Court of Appeals relied exclusively on that portion of the Sixth Amendment providing, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel in Anglo-American law has a rich historical heritage, and this Court has regularly drawn on that history in construing the counsel guarantee of the Sixth Amendment. We re-examine that history in an effort to determine the relationship between the purposes of the Sixth Amendment guarantee and the risks of a photographic identification.

In *Powell* v. *Alabama,* 287 U. S. 45, 60–66 (1932), the Court discussed the English common-law rule that severely limited the right of a person accused of a felony to consult with counsel at trial. The Court examined colonial constitutions and statutes and noted that "in at least twelve of the thirteen colonies the rule of the English common law, in the respect now under consideration, had been definitely rejected and the right to counsel fully recognized in all criminal prosecutions, save that in one or two instances the right was limited to capital offenses or to the more serious crimes." *Id.,* at 64–65. The Sixth Amendment counsel guarantee, thus, was derived from colonial statutes and constitutional provisions designed to reject the English common-law rule.

Apparently several concerns contributed to this rejection at the very time when countless other aspects of the common law were being imported. One consideration was the inherent irrationality of the English limitation. Since the rule was limited to felony proceedings, the result, absurd and illogical, was that an accused misdemeanant could rely fully on counsel, but

the accused felon, in theory at least,[6] could consult counsel only on legal questions that the accused proposed to the court.  See *Powell* v. *Alabama,* 287 U. S., at 60. English writers were appropriately critical of this inconsistency.  See, for example, 4 W. Blackstone, Commentaries *355.

A concern of more lasting importance was the recognition and awareness that an unaided layman had little skill in arguing the law or in coping with an intricate procedural system.  The function of counsel as a guide through complex legal technicalities long has been recognized by this Court.  Mr. Justice Sutherland's well-known observations in *Powell* bear repeating here:

> "Even the intelligent and educated layman has small and sometimes no skill in the science of law.  If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad.  He is unfamiliar with the rules of evidence.  Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.  He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one.  He requires the guiding hand of counsel at every step in the proceedings against him.  Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."  287 U. S., at 69.

The Court frequently has interpreted the Sixth Amend-

---

[6] Although the English limitation was not expressly rejected until 1836, the rule appears to have been relaxed in practice.  9 W. Holdsworth, History of English Law 235 (1926); 4 W. Blackstone, Commentaries *355–356.

308

ment to assure that the "guiding hand of counsel" is available to those in need of its assistance. See, for example, *Gideon* v. *Wainwright,* 372 U. S. 335, 344–345 (1963), and *Argersinger* v. *Hamlin,* 407 U. S. 25, 31 (1972).

Another factor contributing to the colonial recognition of the accused's right to counsel was the adoption of the institution of the public prosecutor from the Continental inquisitorial system. One commentator has explained the effect of this development:

> "[E]arly in the eighteenth century the American system of judicial administration adopted an institution which was (and to some extent still is) unknown in England: while rejecting the fundamental juristic concepts upon which continental Europe's inquisitorial system of criminal procedure is predicated, the colonies borrowed one of its institutions, the public prosecutor, and grafted it upon the body of English (accusatorial) procedure embodied in the common law. Presumably, this innovation was brought about by the lack of lawyers, particularly in the newly settled regions, and by the increasing distances between the colonial capitals on the eastern seaboard and the ever-receding western frontier. Its result was that, at a time when virtually all but treason trials in England were still in the nature of suits between private parties, the accused in the colonies faced a government official whose specific function it was to prosecute, and who was incomparably more familiar than the accused with the problems of procedure, the idiosyncrasies of juries, and, last but not least, the personnel of the court." F. Heller, The Sixth Amendment 20–21 (1951) (footnote omitted).

Thus, an additional motivation for the American rule was a desire to minimize the imbalance in the adversary system that otherwise resulted with the creation of a professional prosecuting official. Mr. Justice Black, writing for the Court in *Johnson* v. *Zerbst*, 304 U. S. 458, 462–463 (1938), spoke of this equalizing effect of the Sixth Amendment's counsel guarantee:

> "It embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel."

This historical background suggests that the core purpose of the counsel guarantee was to assure "Assistance" at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor.[7] Later developments have led this Court

---

[7] Similar concerns eventually led to abandonment of the common-law rule in England. That rule originated at a time when counsel was said to be "hardly necessary" because expert knowledge of the law was not required at trial and systematic examination of witnesses had not yet developed. T. Plucknett, A Concise History of the Common Law 410 (4th ed. 1948).

Confrontation with legal technicalities became common at English trials when complex rules developed for attacking the indictment. *Ibid.* The English response was not an unlimited right to counsel, however, but was rather a right for counsel to argue only legal questions. See *Powell* v. *Alabama*, 287 U. S. 45, 60 (1932). A plea in abatement directed at insufficiency of the indictment, for example, allowed a prisoner to "pray counsel to be assigned to him to manage his exceptions and take more." 2 M. Hale, Pleas of the Crown 236 (1736).

Confrontation with a professional prosecutor arose in English treason trials before it appeared in ordinary criminal trials. See 1 J. Stephen, History of the Criminal Law of England 348–350 (1883). In 1695 this imbalance in the adversary process was corrected by a

to recognize that "Assistance" would be less than meaningful if it were limited to the formal trial itself.

This extension of the right to counsel to events before trial has resulted from changing patterns of criminal procedure and investigation that have tended to generate pretrial events that might appropriately be considered to be parts of the trial itself. At these newly emerging and significant events, the accused was confronted, just as at trial, by the procedural system, or by his expert adversary, or by both. In *Wade*, the Court explained the process of expanding the counsel guarantee to these confrontations:

> "When the Bill of Rights was adopted, there were no organized police forces as we know them today. The accused confronted the prosecutor and the witnesses against him, and the evidence was marshalled, largely at the trial itself. In contrast, today's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality. In recognition of these realities of modern criminal prosecution, our cases have construed the Sixth Amendment guarantee to apply to 'critical'

statute granting prisoners the right to counsel at treason trials. 7 Wm. 3, c. 3 (1695). Hawkins explained that the professional ability of king's counsel motivated this reform because it had "been found by experience that prisoners have been often under great disadvantages from the want of counsel, in prosecutions of high treason against the king's person, which are generally managed for the crown with greater skill and zeal than ordinary prosecutions . . . ." 2 W. Hawkins, Pleas of the Crown 566 (Leach ed. 1787). The 1695 statute weakened the English rule and, after a century of narrowing practical application, see n. 6, *supra*, the rule was finally abrogated by statute in 1836. The Trials for Felony Act, 6 & 7 Wm. 4, c. 114 (1836).

stages of the proceedings." 388 U. S., at 224 (footnote omitted).

The Court consistently has applied a historical interpretation of the guarantee, and has expanded the constitutional right to counsel only when new contexts appear presenting the same dangers that gave birth initially to the right itself.

Recent cases demonstrate the historical method of this expansion. In *Hamilton* v. *Alabama,* 368 U. S. 52 (1961), and in *White* v. *Maryland,* 373 U. S. 59 (1963), the accused was confronted with the procedural system and was required, with definite consequences, to enter a plea. In *Massiah* v. *United States,* 377 U. S. 201 (1964), the accused was confronted by prosecuting authorities who obtained, by ruse and in the absence of defense counsel, incriminating statements. In *Coleman* v. *Alabama,* 399 U. S. 1 (1970), the accused was confronted by his adversary at a "critical stage" preliminary hearing at which the uncounseled accused could not hope to obtain so much benefit as could his skilled adversary.

The analogy between the unrepresented accused at the pretrial confrontation and the unrepresented defendant at trial, implicit in the cases mentioned above, was explicitly drawn in *Wade:*

> "The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man.' " 388 U. S., at 235–236.

Throughout this expansion of the counsel guarantee to trial-like confrontations, the function of the lawyer has remained essentially the same as his function at trial. In all cases considered by the Court, counsel has continued to act as a spokesman for, or advisor to, the accused. The accused's right to the "Assistance of Counsel" has meant just that, namely, the right of the accused to have counsel acting as his assistant. In *Hamilton* and *White,* for example, the Court envisioned the lawyer as advising the accused on available defenses in order to allow him to plead intelligently. 368 U. S., at 54–55; 373 U. S., at 60. In *Massiah* counsel could have advised his client on the benefits of the Fifth Amendment and could have sheltered him from the overreaching of the prosecution. 377 U. S., at 205. Cf. *Miranda* v. *Arizona,* 384 U. S. 436, 466 (1966). In *Coleman* the skill of the lawyer in examining witnesses, probing for evidence, and making legal arguments was relied upon by the Court to demonstrate that, in the light of the purpose of the preliminary hearing under Alabama law, the accused required "Assistance" at that hearing. 399 U. S., at 9.

The function of counsel in rendering "Assistance" continued at the lineup under consideration in *Wade* and its companion cases. Although the accused was not confronted there with legal questions, the lineup offered opportunities for prosecuting authorities to take advantage of the accused. Counsel was seen by the Court as being more sensitive to, and aware of, suggestive influences than the accused himself, and as better able to reconstruct the events at trial. Counsel present at lineup would be able to remove disabilities of the accused in precisely the same fashion that counsel compensated for the disabilities of the layman at trial. Thus, the Court mentioned that the accused's memory might be dimmed by "emotional tension," that the accused's credibility at

trial would be diminished by his status as defendant, and that the accused might be unable to present his version effectively without giving up his privilege against compulsory self-incrimination. *United States* v. *Wade,* 388 U. S., at 230–231. It was in order to compensate for these deficiencies that the Court found the need for the assistance of counsel.

This review of the history and expansion of the Sixth Amendment counsel guarantee demonstrates that the test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary. Against the background of this traditional test, we now consider the opinion of the Court of Appeals.

### III

Although the Court of Appeals' majority recognized the argument that "a major purpose behind the right to counsel is to protect the defendant from errors that he himself might make if he appeared in court alone," the court concluded that "other forms of prejudice," mentioned and recognized in *Wade,* could also give rise to a right to counsel. 149 U. S. App. D. C., at 10, 461 F. 2d, at 101. These forms of prejudice were felt by the court to flow from the possibilities for mistaken identification inherent in the photographic display.[8]

---

[8] "[T]he dangers of mistaken identification from uncounseled lineup identifications set forth in *Wade* are applicable in large measure to photographic as well as corporeal identifications. These include, notably, the possibilities of suggestive influence or mistake—particularly where witnesses had little or no opportunity for detailed observation during the crime; the difficulty of reconstructing suggestivity—even greater when the defendant is not even present; the tendency of a witness's identification, once given under these circumstances, to be frozen. While these difficulties may be somewhat mitigated by preserving the photograph shown, it may also be said that a photograph can preserve the record of a lineup; yet this does

We conclude that the dangers of mistaken identification, mentioned in *Wade,* were removed from context by the Court of Appeals and were incorrectly utilized as a sufficient basis for requiring counsel. Although *Wade* did discuss possibilities for suggestion and the difficulty for reconstructing suggestivity, this discussion occurred only after the Court had concluded that the lineup constituted a trial-like confrontation, requiring the "Assistance of Counsel" to preserve the adversary process by compensating for advantages of the prosecuting authorities.

The above discussion of *Wade* has shown that the traditional Sixth Amendment test easily allowed extension of counsel to a lineup. The similarity to trial was apparent, and counsel was needed to render "Assistance" in counterbalancing any "overreaching" by the prosecution.

After the Court in *Wade* held that a lineup constituted a trial-like confrontation requiring counsel, a more difficult issue remained in the case for consideration. The same changes in law enforcement that led to lineups and pretrial hearings also generated other events at which the accused was confronted by the prosecution. The Government had argued in *Wade* that if counsel was required at a lineup, the same forceful considerations would mandate counsel at other preparatory steps in the "gathering of the prosecution's evidence," such as, for

not justify a lineup without counsel. The same may be said of the opportunity to examine the participants as to what went on in the course of the identification, whether at lineup or on photograph. Sometimes this may suffice to bring out all pertinent facts, even at a lineup, but this would not suffice under *Wade* to offset the constitutional infringement wrought by proceeding without counsel. The presence of counsel avoids possibilities of suggestiveness in the manner of presentation that are otherwise ineradicable." 149 U. S. App. D. C., at 9–10, 461 F. 2d, at 100–101.

particular example, the taking of fingerprints or blood samples. 388 U. S., at 227.

The Court concluded that there were differences. Rather than distinguishing these situations from the lineup in terms of the need for counsel to assure an equal confrontation at the time, the Court recognized that there were times when the subsequent trial would cure a one-sided confrontation between prosecuting authorities and the uncounseled defendant. In other words, such stages were not "critical." Referring to fingerprints, hair, clothing, and other blood samples, the Court explained:

> "Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." 388 U. S., at 227–228.

The structure of *Wade,* viewed in light of the careful limitation of the Court's language to "confrontations," [9]

---

[9] The Court rather narrowly defined the issues under consideration: "The pretrial *confrontation* for purpose of identification may take the form of a lineup, also known as an 'identification parade' or 'showup,' as in the present case, or presentation of the suspect alone to the witness, as in *Stovall* v. *Denno, supra.* It is obvious that risks of suggestion attend either form of *confrontation* . . . . But as is the case with secret interrogations, there is serious difficulty in depicting what transpires at lineups and *other forms of identification confrontations." United States* v. *Wade,* 388 U. S. 218, 229–230 (1967) (emphasis added).

The photographic identification could hardly have been overlooked by inadvertence since the Government stressed the similarity between lineups and photographic identifications. Brief for United States in *Wade,* No. 334, O. T. 1966, pp. 7, 14, 19, 24.

makes it clear that lack of scientific precision and inability to reconstruct an event are not the tests for requiring counsel in the first instance. These are, instead, the tests to determine whether confrontation with counsel at trial can serve as a substitute for counsel at the pretrial confrontation. If accurate reconstruction is possible, the risks inherent in any confrontation still remain, but the opportunity to cure defects at trial causes the confrontation to cease to be "critical." The opinion of the Court even indicated that changes in procedure might cause a lineup to cease to be a "critical" confrontation:

> "Legislative or other regulations, such as those of local police departments, which eliminate the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial may also remove the basis for regarding the stage as 'critical.'" 388 U. S., at 239 (footnote omitted).

See, however, *id.*, at 262 n. (opinion of Fortas, J.).

The Court of Appeals considered its analysis complete after it decided that a photographic display lacks scientific precision and ease of accurate reconstruction at trial. That analysis, under *Wade,* however, merely carries one to the point where one must establish that the trial itself can provide no substitute for counsel if a pretrial confrontation is conducted in the absence of counsel. Judge Friendly, writing for the Second Circuit in *United States* v. *Bennett,* 409 F. 2d 888 (1969), recognized that the "criticality" test of *Wade,* if applied outside the confrontation context, would result in drastic expansion of the right to counsel:

> "None of the classical analyses of the assistance to be given by counsel, Justice Sutherland's in Powell v. Alabama . . . and Justice Black's in Johnson v.

Zerbst . . . and Gideon v. Wainwright . . . suggests that counsel must be present when the prosecution is interrogating witnesses in the defendant's absence even when, as here, the defendant is under arrest; counsel is rather to be provided to prevent the defendant himself from falling into traps devised by a lawyer on the other side and to see to it that all available defenses are proffered. Many other aspects of the prosecution's interviews with a victim or a witness to a crime afford just as much opportunity for undue suggestion as the display of photographs; so, too, do the defense's interviews, notably with alibi witnesses." *Id.*, at 899–900.

We now undertake the threshhold analysis that must be addressed.

## IV

A substantial departure from the historical test would be necessary if the Sixth Amendment were interpreted to give Ash a right to counsel at the photographic identification in this case. Since the accused himself is not present at the time of the photographic display, and asserts no right to be present, Brief for Respondent 40, no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary. Similarly, the counsel guarantee would not be used to produce equality in a trial-like adversary confrontation. Rather, the guarantee was used by the Court of Appeals to produce confrontation at an event that previously was not analogous to an adversary trial.

Even if we were willing to view the counsel guarantee in broad terms as a generalized protection of the adversary process, we would be unwilling to go so far as to extend the right to a portion of the prosecutor's trial-preparation interviews with witnesses. Although pho-

tography is relatively new, the interviewing of witnesses before trial is a procedure that predates the Sixth Amendment. In England in the 16th and 17th centuries counsel regularly interviewed witnesses before trial. 9 W. Holdsworth, History of English Law 226–228 (1926). The traditional counterbalance in the American adversary system for these interviews arises from the equal ability of defense counsel to seek and interview witnesses himself.

That adversary mechanism remains as effective for a photographic display as for other parts of pretrial interviews.[10] No greater limitations are placed on defense counsel in constructing displays, seeking witnesses, and conducting photographic identifications than those applicable to the prosecution.[11] Selection of the picture of a person other than the accused, or the inability of a witness to make any selection, will be useful to the defense in precisely the same manner that the selection of

---

[10] Duplication by defense counsel is a safeguard that normally is not available when a formal confrontation occurs. Defense counsel has no statutory authority to conduct a preliminary hearing, for example, and defense counsel will generally be prevented by practical considerations from conducting his own lineup. Even in some confrontations, however, the possibility of duplication may be important. The Court noted this in holding that the taking of handwriting exemplars did not constitute a "critical stage":

"If, for some reason, an unrepresentative exemplar is taken, this can be brought out and corrected through the adversary process at trial since the accused can make an unlimited number of additional exemplars for analysis and comparison by government and defense handwriting experts." *Gilbert* v. *California*, 388 U. S. 263, 267 (1967).

[11] We do not suggest, of course, that defense counsel has any greater freedom than the prosecution to abuse the photographic identification. Evidence of photographic identifications conducted by the defense may be excluded as unreliable under the same standards that would be applied to unreliable identifications conducted by the Government.

a picture of the defendant would be useful to the prosecution.[12]   In this very case, for example, the initial tender of the photographic display was by Bailey's counsel, who sought to demonstrate that the witness had failed to make a photographic identification.   Although we do not suggest that equality of access to photographs removes all potential for abuse,[13] it does remove any inequality in the adversary process itself and thereby fully satisfies the historical spirit of the Sixth Amendment's counsel guarantee.

The argument has been advanced that requiring counsel might compel the police to observe more scientific procedures or might encourage them to utilize corporeal rather than photographic displays.[14]   This Court has

[12] The Court of Appeals deemed it significant that a photographic identification is admissible as substantive evidence, whereas other parts of interviews may be introduced only for impeachment.   149 U. S. App. D. C., at 10, 461 F. 2d, at 101.   In this case defense counsel for Bailey introduced the inability to identify, and that was received into evidence.   Thus defense counsel still received benefits equivalent to those available to the prosecution.   Although defense counsel may be concerned that repeated photographic displays containing the accused's picture as the only common characteristic will tend to promote identification of the accused, the defense has other balancing devices available to it, such as the use of a sufficiently large number of photographs to counteract this possibility.

[13] Although the reliability of in-court identifications and the effectiveness of impeachment may be improved by equality of access, we do not suggest that the prosecution's photographic identification would be more easily reconstructed at trial simply because defense counsel could conduct his own photographic display.   But, as we have explained, *supra*, at 315–316, the possibility of perfect reconstruction is relevant to the evaluation of substitutes for counsel, not to the initial designation of an event as a "critical stage."

[14] Sobel, Assailing the Impermissible Suggestion: Evolving Limitations on the Abuse of Pre-Trial Criminal Identification Methods, 38 Brooklyn L. Rev. 261, 299 (1971); Comment, 43 N. Y. U. L. Rev. 1019, 1022 (1968); Note, 2 Rutgers Camden L. J. 347, 359 (1970); Note, 21 Syracuse L. Rev. 1235, 1241–1242 (1970).   A variant of

recognized that improved procedures can minimize the dangers of suggestion. *Simmons* v. *United States,* 390 U. S. 377, 386 n. 6 (1968). Commentators have also proposed more accurate techniques.[15]

Pretrial photographic identifications, however, are hardly unique in offering possibilities for the actions of the prosecutor unfairly to prejudice the accused. Evidence favorable to the accused may be withheld; testimony of witnesses may be manipulated; the results of laboratory tests may be contrived. In many ways the prosecutor, by accident or by design, may improperly subvert the trial. The primary safeguard against abuses of this kind is the ethical responsibility of the prosecutor,[16] who, as so often has been said, may "strike hard blows" but not "foul ones." *Berger* v. *United States,* 295 U. S. 78, 88 (1935); *Brady* v. *Maryland,* 373 U. S. 83, 87–88 (1963). If that safeguard fails, review remains available under due process standards. See *Giglio* v. *United States,* 405 U. S. 150 (1972); *Mooney* v. *Holohan,* 294 U. S. 103, 112 (1935); *Miller* v. *Pate,* 386 U. S. 1 (1967); *Chambers* v. *Mississippi,* 410 U. S. 284 (1973). These same safeguards apply to misuse of photographs. See *Simmons* v. *United States,* 390 U. S., at 384.

---

this argument is that photographic identifications may be used to circumvent the need for counsel at lineups. Brief for Respondent 44–45.

[15] *E. g.,* P. Wall, Eye-Witness Identification in Criminal Cases 77–85 (1965); Sobel, *supra,* n. 14, at 309–310; Comment, 56 Iowa L. Rev. 408, 420–421 (1970).

[16] Throughout a criminal prosecution the prosecutor's ethical responsibility extends, of course, to supervision of any continuing investigation of the case. By prescribing procedures to be used by his agents and by screening the evidence before trial with a view to eliminating unreliable identifications, the prosecutor is able to minimize abuse in photographic displays even if they are conducted in his absence.

We are not persuaded that the risks inherent in the use of photographic displays are so pernicious that an extraordinary system of safeguards is required.

We hold, then, that the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender. This holding requires reversal of the judgment of the Court of Appeals. Although respondent Ash has urged us to examine this photographic display under the due process standard enunciated in *Simmons* v. *United States,* 390 U. S., at 384, the Court of Appeals, expressing the view that additional findings would be necessary, refused to decide the issue. 149 U. S. App. D. C., at 7, 461 F. 2d, at 98. We decline to consider this question on this record in the first instance. It remains open, of course, on the Court of Appeals' remand to the District Court.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring in the judgment.

The issue in the present case is whether, under the Sixth Amendment, a person who has been indicted is entitled to have a lawyer present when prosecution witnesses are shown the person's photograph and asked if they can identify him.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This Court's decisions make it clear that a defendant is entitled to the assistance of counsel not only at the trial itself, but at all "critical stages" of his "prosecution." See *Coleman* v. *Alabama,* 399 U. S. 1; *United States* v. *Wade,* 388 U. S. 218; *Gilbert* v. *California,* 388 U. S. 263; *Hamilton* v. *Alabama,* 368 U. S. 52. The requirement

that there be a "prosecution," means that this constitutional "right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against [an accused]. . . ." "It is this point . . . that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Kirby* v. *Illinois,* 406 U. S. 682, 688, 690 (plurality opinion). Since the photographic identification in the present case occurred after the accused had been indicted, and thus clearly after adversary judicial proceedings had been initiated, the only question is whether that procedure was such a "critical stage" that the Constitution required the presence of counsel.

In *United States* v. *Wade, supra,* the Court determined that a pretrial proceeding is a "critical stage" if "the presence of . . . counsel is necessary to preserve the defendant's . . . right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." 388 U. S., at 227. Pretrial proceedings are "critical," then, if the presence of counsel is essential "to protect the fairness of the trial itself." *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 239; cf. *Coleman* v. *Alabama,* 399 U. S. 1, 27–28 (STEWART, J., dissenting).

The Court held in *Wade* that a post-indictment, pretrial lineup at which the accused was exhibited to identifying witnesses was such a critical stage, because of the substantial possibility that the accused's right to a fair trial would otherwise be irretrievably lost. The hazard of unfair suggestive influence at a lineup, which, because of the nature of the proceeding, could seldom be reconstructed at trial, left little doubt, the Court thought, "that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid [of counsel] . . . as at the trial itself.'" 388 U. S., at 237.

The Court stressed in *Wade* that the danger of mistaken identification at trial was appreciably heightened by the "degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *Id.*, at 228. There are numerous and subtle possibilities for such improper suggestion in the dynamic context of a lineup. Judge Wilkey, dissenting in the present case, accurately described a lineup as:

"a little drama, stretching over an appreciable span of time. The accused is there in the flesh, three-dimensional and always full-length. Further, he isn't merely there, he acts. He walks on stage, he blinks in the glare of lights, he turns and twists, often muttering asides to those sharing the spotlight. He can be required to utter significant words, to turn a profile or back, to walk back and forth, to doff one costume and don another. All the while the potentially identifying witness is watching, a prosecuting attorney and a police detective at his elbow, ready to record the witness' every word and reaction." 149 U. S. App. D. C. 1, 17, 461 F. 2d 92, 108.

With no attorney for the accused present at this "little drama," defense counsel at trial could seldom convincingly discredit a witness' courtroom identification by showing it to be based on an impermissibly suggestive lineup. In addition to the problems posed by the fluid nature of a lineup, the Court in *Wade* pointed out that neither the witnesses nor the lineup participants were likely to be alert for suggestive influences or schooled in their detection. "In short, the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." 388 U. S., at 231–232.

The Court held, therefore, that counsel was required at a lineup, primarily as an observer, to ensure that defense counsel could effectively confront the prosecution's evidence at trial. Attuned to the possibilities of suggestive influences, a lawyer could see any unfairness at a lineup, question the witnesses about it at trial, and effectively reconstruct what had gone on for the benefit of the jury or trial judge.*

A photographic identification is quite different from a lineup, for there are substantially fewer possibilities of impermissible suggestion when photographs are used, and those unfair influences can be readily reconstructed at trial. It is true that the defendant's photograph may be markedly different from the others displayed, but this unfairness can be demonstrated at trial from an actual comparison of the photographs used or from the witness' description of the display. Similarly, it is possible that the photographs could be arranged in a suggestive manner, or that by comment or gesture the prosecuting authorities might single out the defendant's picture. But these are the kinds of overt influence that a witness can easily recount and that would serve to impeach the identification testimony. In short, there are few possibilities for unfair suggestiveness—and those rather blatant and easily reconstructed. Accordingly, an accused would not be foreclosed from an effective cross-examination of an identification witness simply because his counsel was

---

*I do not read *Wade* as requiring counsel because a lineup is a "trial-type" situation, nor do I understand that the Court required the presence of an attorney because of the advice or assistance he could give to his client at the lineup itself. Rather, I had thought the reasoning of *Wade* was that the right to counsel is essentially a protection for the defendant at trial, and that counsel is necessary at a lineup in order to ensure a meaningful confrontation and the effective assistance of counsel at trial.

not present at the photographic display. For this reason, a photographic display cannot fairly be considered a "critical stage" of the prosecution. As the Court of Appeals for the Third Circuit aptly concluded:

> "If . . . the identification is not in a live lineup at which defendant may be forced to act, speak or dress in a suggestive way, where the possibilities for suggestion are multiplied, where the ability to reconstruct the events is minimized, and where the effect of a positive identification is likely to be permanent, but at a viewing of immobile photographs easily reconstructible, far less subject to subtle suggestion, and far less indelible in its effect when the witness is later brought face to face with the accused, there is even less reason to denominate the procedure a critical stage at which counsel must be present." *United States ex rel. Reed* v. *Anderson*, 461 F. 2d 739, 745.

Preparing witnesses for trial by checking their identification testimony against a photographic display is little different, in my view, from the prosecutor's other interviews with the victim or other witnesses before trial. See *United States* v. *Bennett*, 409 F. 2d 888, 900. While these procedures can be improperly conducted, the possibility of irretrievable prejudice is remote, since any unfairness that does occur can usually be flushed out at trial through cross-examination of the prosecution witnesses. The presence of defense counsel at such pretrial preparatory sessions is neither appropriate nor necessary under our adversary system of justice "to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." *United States* v. *Wade, supra*, at 227.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

The Court holds today that a pretrial display of photographs to the witnesses of a crime for the purpose of identifying the accused, unlike a lineup, does not constitute a "critical stage" of the prosecution at which the accused is constitutionally entitled to the presence of counsel. In my view, today's decision is wholly unsupportable in terms of such considerations as logic, consistency, and, indeed, fairness. As a result, I must reluctantly conclude that today's decision marks simply another [1] step towards the complete evisceration of the fundamental constitutional principles established by this Court, only six years ago, in *United States* v. *Wade,* 388 U. S. 218 (1967); *Gilbert* v. *California,* 388 U. S. 263 (1967); and *Stovall* v. *Denno,* 388 U. S. 293 (1967). I dissent.

I

On the morning of August 26, 1965, two men wearing stocking masks robbed the American Security and Trust Co. in Washington, D. C. The robbery lasted only about three or four minutes and, on the day of the crime, none of the four witnesses was able to give the police a description of the robbers' facial characteristics. Some five months later, on February 3, 1966, an FBI agent showed each of the four witnesses a group of black and white mug shots of the faces of five black males, including respondent, all of generally the same age, height, and weight. Respondent's photograph was included because of information received from a Government informant charged with other crimes.[2] None of the wit-

---

[1] See *Kirby* v. *Illinois,* 406 U. S. 682 (1972).

[2] At the time of respondent's trial, the informant, one Clarence McFarland, was serving a sentence for bank robbery. According to the Court of Appeals, "McFarland had been before the grand jury

nesses was able to make a "positive" identification of respondent.[3]

On April 1, 1966, an indictment was returned charging respondent and a codefendant in five counts relating to the robbery of the American Security and Trust Co. Trial was finally set for May 8, 1968, almost three years after the crime and more than two years after the return of the indictment. During the entire two-year period between indictment and trial, although one of the witnesses expressly sought an opportunity to see respondent in person, the Government never attempted to arrange a corporeal lineup for the purposes of identification. Rather, *less than 24 hours before trial,* the FBI agent, accompanied by the prosecutor, showed five color photographs to the witnesses, three of whom identified the picture of respondent.

At trial, all four witnesses made in-court identifications of respondent, but only one of these witnesses was "positive" of her identification. The fact that three of the witnesses had previously identified respondent from the color photographs, and the photographs themselves, were also admitted into evidence. The only other evi-

with regard to five separate offenses, in addition to his bank robbery, and had not been indicted on any of them, including one in which he had confessed guilt. The Assistant United States Attorney had arranged to have McFarland transferred from the D. C. Jail to a local jail in Rockville, Maryland, and in addition had helped McFarland's wife move from Southeast Washington to an apartment near the parochial school that McFarland's children were due to attend. 149 U. S. App. D. C. 1, 6 n. 7, 461 F. 2d 92, 97 n. 7 (1972). The Assistant United States Attorney also testified that he "had indicated he would testify before the parole board in McFarland's behalf." *Id.,* at 6, 461 F. 2d, at 97.

[3] Respondent does not contend that he was denied his Sixth Amendment right to counsel at the pre-indictment display of the black and white photographs. Tr. of Oral Arg. 21–22; Brief for Respondent 32 n. 21.

dence implicating respondent in the crime was the testimony of the Government informant.[4]   On the basis of this evidence, respondent was convicted on all counts of the indictment.

On appeal, the United States Court of Appeals for the District of Columbia Circuit, sitting en banc, reversed respondent's conviction.   149 U. S. App. D. C. 1, 461 F. 2d 92 (1972).   Noting that "the dangers of mistaken identification from uncounseled lineup identifications . . . are applicable in large measure to photographic as well as corporeal identifications,"[5] the Court of Appeals reasoned that this Court's decisions in *Wade, Gilbert,* and *Stovall,* compelled the conclusion that a pretrial photographic identification, like a lineup, is a "critical" stage of the prosecution at which the accused is constitutionally entitled to the attendance of counsel.   Accordingly, the Court of Appeals held that respondent was denied his Sixth Amendment right to "the Assistance of Counsel for his defence" when his attorney was not given an opportunity to attend the display of the color photographs on the very eve of trial.[6]   In my view, both the reasoning and conclusion of the Court of Appeals were unimpeachably correct, and I would therefore affirm.

## II

In June 1967, this Court decided a trilogy of "lineup" cases which brought into sharp focus the problems of

---

[4] As the Court of Appeals noted, this testimony was of at least questionable credibility.   See n. 2, *supra.*

[5] 149 U. S. App. D. C., at 9, 461 F. 2d, at 100.

[6] The Court of Appeals also noted "that there are at the very least strong elements of suggestiveness in this color photo confrontation," and that "it is hard to see how the Government can be held to have shown, by clear and convincing evidence, that these color photographs did not affect the in-court identification made one day later."   *Id.,* at 7, 14 n. 20, 461 F. 2d, at 98, 105 n. 20.

pretrial identification.   See *United States* v. *Wade, supra;*
*Gilbert* v. *California, supra; Stovall* v. *Denno, supra.*   In
essence, those decisions held (1) that a pretrial lineup
is a "critical stage" in the criminal process at which the
accused is constitutionally entitled to the presence of
counsel; (2) that evidence of an identification of the
accused at such an uncounseled lineup is *per se* inad-
missible; and (3) that evidence of a subsequent in-court
identification of the accused is likewise inadmissible un-
less the Government can demonstrate by clear and con-
vincing evidence that the in-court identification was based
upon observations of the accused independent of the
prior uncounseled lineup identification.   The considera-
tions relied upon by the Court in reaching these con-
clusions are clearly applicable to photographic as well as
corporeal identifications.   Those considerations bear re-
peating here in some detail, for they touch upon the
very heart of our criminal justice system—the right of
an accused to a fair trial, including the effective "Assist-
ance of Counsel for his defence."

At the outset, the Court noted that "identification
evidence is peculiarly riddled with innumerable dangers
and variable factors which might seriously, even crucially,
derogate from a fair trial."   *United States* v. *Wade, supra,*
at 228.   Indeed, "[t]he vagaries of eyewitness identifi-
cation are well-known; the annals of criminal law are
rife with instances of mistaken identification."   *Ibid.*
Apart from "the dangers inherent in eyewitness identi-
fication," *id.,* at 235, such as unreliable memory or percep-
tion, the Court pointed out that "[a] major factor con-
tributing to the high incidence of miscarriage of justice
from mistaken identification has been the degree of sug-
gestion inherent in the manner in which the prosecution
presents the suspect to witnesses for pretrial identifica-
tion."   *Id.,* at 228.   The Court recognized that the dan-
gers of suggestion are not necessarily due to "police

procedures intentionally designed to prejudice an accused." *Id.,* at 235. On the contrary, "[s]uggestion can be created intentionally or unintentionally in many subtle ways." *Id.,* at 229. And the " 'fact that the police themselves have, in a given case, little or no doubt that the man put up for identification has committed the offense . . . involves a danger that this persuasion may communicate itself even in a doubtful case to the witness in some way . . . .' " *Id.,* at 235, quoting Williams & Hammelmann, Identification Parades–I, [1963] Crim. L. Rev. 479, 483.

The Court also expressed concern over the possibility that a mistaken identification at a pretrial lineup might itself be conclusive on the question of identity, thereby resulting in the conviction of an innocent man. The Court observed that " 'once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " *United States* v. *Wade, supra,* at 229, quoting Williams & Hammelmann, *supra,* at 482.

Moreover, "the defense can seldom reconstruct the manner and mode of lineup identification for judge or jury at trial." *United States* v. *Wade, supra,* at 230. For "as is the case with secret interrogations, there is serious difficulty in depicting what transpires at lineups . . . ." *Ibid.* Although the accused is present at such corporeal identifications, he is hardly in a position to detect many of the more subtle "improper influences" that might infect the identification.[7] In addition, the Court empha-

---

[7] The Court pointed out that "[i]mproper influences may go undetected by a suspect, guilty or not, who experiences the emotional tension which we might expect in one being confronted with potential accusers. Even when he does observe abuse, if he has a criminal

sized that "neither witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect. And, if they were, it would likely be of scant benefit to the suspect since neither witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences." *Ibid.* As a result, "even though cross-examination is a precious safeguard to a fair trial, it cannot [in this context] be viewed as an absolute assurance of accuracy and reliability." *Id.,* at 235.

With these considerations in mind, the Court reasoned that "the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." *Id.,* at 231–232. And "[i]nsofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him." *Id.,* at 235. Thus, noting that "presence of counsel [at the lineup] can often avert prejudice and assure a meaningful confrontation at trial," the Court concluded that a pretrial corporeal identification is "a critical stage of the prosecution at which [the accused is] 'as much entitled to such aid [of counsel] . . . as at the trial itself.' " *Id.,* at 236, 237, quoting *Powell* v. *Alabama,* 287 U. S. 45, 57 (1932).

---

record he may be reluctant to take the stand and open up the admission of prior convictions. Moreover, any protestations by the suspect of the fairness of the lineup made at trial are likely to be in vain; the jury's choice is between the accused's unsupported version and that of the police officers present." *United States* v. *Wade,* 388 U. S. 218, 230–231 (1967).

## III

As the Court of Appeals recognized, "the dangers of mistaken identification . . . set forth in *Wade* are applicable in large measure to photographic as well as corporeal identifications." 149 U. S. App. D. C., at 9, 461 F. 2d, at 100. To the extent that misidentification may be attributable to a witness' faulty memory or perception, or inadequate opportunity for detailed observation during the crime, the risks are obviously as great at a photographic display as at a lineup.[8] But "[b]ecause of the inherent limitations of photography, which presents its subject in two dimensions rather than the three dimensions of reality, . . . a photographic identification, even when properly obtained, is clearly inferior to a properly obtained corporeal identification." P. Wall, Eye-Witness Identification in Criminal Cases 70 (1965). Indeed, noting "the hazards of initial identification by photograph," we have expressly recognized that "a corporeal identification . . . is normally more accurate" than a photographic identification. *Simmons* v. *United States,* 390 U. S. 377, 384, 386 n. 6 (1968).[9] Thus, in this sense at

---

[8] Thus, "[a] witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures . . . there is some danger that the witness may make an incorrect identification." *Simmons* v. *United States,* 390 U. S. 377, 383 (1968).

[9] See also Sobel, Assailing the Impermissible Suggestion: Evolving Limitations on the Abuse of Pre-Trial Criminal Identification Methods, 38 Brooklyn L. Rev. 261, 264, 296 (1971); Williams, Identification Parades, [1955] Crim. L. Rev. 525, 531; Comment, Photographic Identification: The Hidden Persuader, 56 Iowa L. Rev. 408, 419 (1970); Note, Pretrial Photographic Identification—A "Critical Stage" of Criminal Proceedings?, 21 Syracuse L. Rev. 1235, 1241 (1970). Indeed, recognizing the superiority of corporeal to photographic identifications, English courts have long held that once the accused is in custody, pre-lineup photographic identification is "in-

least, the dangers of misidentification are even greater at a photographic display than at a lineup.

Moreover, as in the lineup situation, the possibilities for impermissible suggestion in the context of a photographic display are manifold. See *id.*, at 383. Such suggestion, intentional or unintentional, may derive from three possible sources. First, the photographs themselves might tend to suggest which of the pictures is that of the suspect. For example, differences in age, pose, or other physical characteristics of the persons represented, and variations in the mounting, background, lighting, or markings of the photographs all might have the effect of singling out the accused.[10]

Second, impermissible suggestion may inhere in the manner in which the photographs are displayed to the witness. The danger of misidentification is, of course, "increased if the police display to the witness . . . the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." *Ibid.* And, if the photographs are arranged in an asymmetrical pattern, or if they are displayed in a time sequence that tends to emphasize a particular photograph, "any identification of the photograph which stands out from the rest is no more reliable than an identification of a single photograph, exhibited alone." P. Wall, *supra,* at 81.

Third, gestures or comments of the prosecutor at the time of the display may lead an otherwise uncertain

---

defensible" and grounds for quashing the conviction. *Rex* v. *Haslam,* 19 Crim. App. Rep. 59, 60 (1925); *Rex* v. *Goss,* 17 Crim. App. Rep. 196, 197 (1923). See also P. Wall, Eye-Witness Identification in Criminal Cases 71 (1965).

[10] See, *e. g.*, Comment, *supra,* n. 9, at 410–411; Note, Criminal Procedure—Photo-Identification—*Stovall* Prospectivity Rule Invoked to Avoid Extension of Right to Counsel, 43 N. Y. U. L. Rev. 1019, 1021 (1968).

witness to select the "correct" photograph. For example, the prosecutor might "indicate to the witness that [he has] other evidence that one of the persons pictured committed the crime,"[11] and might even point to a particular photograph and ask whether the person pictured "looks familiar." More subtly, the prosecutor's inflection, facial expressions, physical motions, and myriad other almost imperceptible means of communication might tend, intentionally or unintentionally, to compromise the witness' objectivity. Thus, as is the case with lineups, "[i]mproper photographic identification procedures, . . . by exerting a suggestive influence upon the witnesses, can often lead to an erroneous identification . . . ." P. Wall, *supra*, at 89.[12] And "[r]egardless of how the initial misidentification comes about, the wit-

---

[11] *Simmons* v. *United States, supra*, at 383.

[12] The Court maintains that "the ethical responsibility of the prosecutor" is in itself a sufficient "safeguard" against impermissible suggestion at a photographic display. See *ante*, at 320. The same argument might, of course, be made with respect to lineups. Moreover, it is clear that the "prosecutor" is not always present at such pretrial displays. Indeed, in this very case, one of the four eyewitnesses was shown the color photographs on the morning of trial by an agent of the FBI, *not* in the presence of the "prosecutor." See 149 U. S. App. D. C., at 5, 461 F. 2d, at 96. And even though "the ethical responsibility of the prosecutor" might be an adequate "safeguard" against *intentional* suggestion, it can hardly be doubted that a "prosecutor" is, after all, only human. His behavior may be fraught with wholly *unintentional* and indeed unconscious nuances that might effectively suggest the "proper" response. See P. Wall, *supra*, n. 9, at 26–65; Napley, Problems of Effecting the Presentation of the Case for a Defendant, 66 Col. L. Rev. 94, 98–99 (1966); Williams & Hammelmann, Identification Parades–I, [1963] Crim. L. Rev. 479, 483. See also *United States* v. *Wade*, supra, at 229, 235, 236. And, of course, as *Wade* itself makes clear, unlike other forms of unintentional prosecutorial "manipulation," even unintentional suggestiveness at an identification procedure involves serious risks of "freezing" the witness' mistaken identification and creates almost insurmountable obstacles to reconstruction at trial.

ness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen . . . ." *Simmons* v. *United States, supra,* at 383–384.[13]  As a result, " 'the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " *United States* v. *Wade, supra,* at 229, quoting Williams & Hammelmann, *supra,* at 482.

Moreover, as with lineups, the defense can "seldom reconstruct" at trial the mode and manner of photographic identification.  It is true, of course, that the photographs used at the pretrial display might be preserved for examination at trial.  But "it may also be said that a photograph can preserve the record of a lineup; yet this does not justify a lineup without counsel."  149 U. S. App. D. C., at 9–10, 461 F. 2d, at 100–101.  Cf. *United States* v. *Wade, supra,* at 239 and n. 30.  Indeed, in reality, preservation of the photographs affords little protection to the unrepresented accused.  For, although retention of the photographs may mitigate the dangers of misidentification due to the suggestiveness of the photographs themselves, it cannot in any sense reveal to defense counsel the more subtle, and therefore more dangerous, suggestiveness that might derive from the manner in which the photographs were displayed or any accompanying comments or gestures.  Moreover, the accused cannot rely upon the witnesses themselves to expose these latter sources of suggestion, for the witnesses are not "apt to be alert for conditions prejudicial to the suspect.  And if they were, it would likely be of scant benefit to the suspect" since the witnesses are hardly "likely to be schooled in the detection of suggestive influences."  *Id.,* at 230.

---

[13] See also P. Wall, *supra,* n. 9, at 68; Napley, *supra,* n. 12, at 98–99; Williams & Hammelmann, *supra,* n. 12, at 484; Comment, *supra,* n. 9, at 411–413; Note, *supra,* n. 10, at 1023.

Finally, and *unlike* the lineup situation, the accused himself is not even present at the photographic identification, thereby reducing the likelihood that irregularities in the procedures will ever come to light. Indeed, in *Wade,* the Government itself observed: [14]

"When the defendant is present—as he is during a lineup—he may personally observe the circumstances, report them to his attorney, and (if he chooses to take the stand) testify about them at trial. . . . [I]n the absence of an accused, on the other hand, there is no one present to verify the fairness of the interview or to report any irregularities. If the prosecution were tempted to engage in 'sloppy or biased or fraudulent' conduct . . . , it would be far more likely to do so when the accused is absent than when he himself is being 'used.'"

Thus, the difficulties of reconstructing at trial an uncounseled photographic display are at least equal to, and possibly greater than, those involved in reconstructing an uncounseled lineup.[15] And, as the Government ar-

---

[14] Brief for United States 24–25 in *United States* v. *Wade,* No. 334, O. T. 1966.

[15] The Court's assertion, *ante,* at 317–319 and n. 10, that these difficulties of reconstruction are somehow minimized because the defense can "duplicate" a photographic identification reflects a complete misunderstanding of the issues in this case. Aside from the fact that lineups can also be "duplicated," the Court's assertion is wholly inconsistent with the underlying premises of both *Wade* and *Gilbert.* For, unlike the Court today, the Court in both of those decisions recognized a critical difference between "systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like," on the one hand, and eyewitness identification, on the other. *United States* v. *Wade, supra,* at 227; *Gilbert* v. *California,* 388 U. S. 263, 267 (1967). In essence, the Court noted in *Wade* and *Gilbert* that, in the former situations, the accused can preserve his right to a fair trial simply by "duplicating" the tests of the Government, thereby enabling him to expose any errors in the Gov-

gued in *Wade,* in terms of the need for counsel, "[t]here is no meaningful difference between a witness' pretrial identification from photographs and a similar identification made at a lineup."[16] For, in both situations "the accused's inability effectively to reconstruct at trial any unfairness that occurred at the [pretrial identification] may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." *United States* v. *Wade, supra,* at 231–232. As

ernment's analysis. Such "duplication" is possible, however, *only* because the accused's tests can be made *independently* of those of the Government—that is, any errors in the Government's analyses cannot affect the reliability of the accused's tests. That simply is not the case, however, with respect to eyewitness identifications, whether corporeal or photographic. Due to the "freezing effect" recognized in *Wade,* once suggestion has tainted the identification, its mark is virtually indelible. For once a witness has made a mistaken identification, " 'he is not likely to go back on his word later on.' " *United States* v. *Wade, supra,* at 229. As a result, any effort of the accused to "duplicate" the initial photographic display will almost necessarily lead to a reaffirmation of the initial misidentification.

The Court's related assertion, that "equality of access" to the results of a Government-conducted photographic display "remove[s] any inequality in the adversary process," *ante,* at 319, is similarly flawed. For due to the possibilities for suggestion, intentional or unintentional, the so-called "equality of access" is, in reality, skewed sharply in favor of the prosecution.

[16] Brief for United States 7, in *United States* v. *Wade, supra.* The Court seems to suggest that, under no circumstances, would it be willing "to go so far as to extend the right [to counsel] to a portion of the prosecutor's trial-preparation interviews with witnesses." *Ante,* at 317. This suggestion illustrates once again the Court's readiness in this area to ignore "real-world" considerations for the sake of "mere formalism." *Kirby* v. *Illinois,* 406 U. S., at 699 (BRENNAN, J., dissenting). Moreover, this suggestion demonstrates the Court's failure to appreciate the essential differences, outlined persuasively by the Court of Appeals, between "the prosecutor's trial-preparation interviews with witnesses" and pretrial identification procedures. See 149 U. S. App. D. C., at 10, 461 F. 2d, at 101.

a result, both photographic and corporeal identifications create grave dangers that an innocent defendant might be convicted simply because of his inability to expose a tainted identification. This being so, considerations of logic, consistency, and, indeed, fairness compel the conclusion that a pretrial photographic identification, like a pretrial corporeal identification, is a "critical stage of the prosecution at which [the accused is] 'as much entitled to such aid [of counsel] . . . as at the trial itself.'" *Id.,* at 237, quoting *Powell* v. *Alabama,* 287 U. S., at 57.

## IV

Ironically, the Court does not seriously challenge the proposition that presence of counsel at a pretrial photographic display is essential to preserve the accused's right to a fair trial on the issue of identification. Rather, in what I can only characterize a triumph of form over substance, the Court seeks to justify its result by engrafting a wholly unprecedented—and wholly unsupportable—limitation on the Sixth Amendment right of "the accused . . . to have the Assistance of Counsel for his defence." Although apparently conceding that the right to counsel attaches, not only at the trial itself, but at all "critical stages" of the prosecution, see *ante,* at 309–311, the Court holds today that, in order to be deemed "critical," the particular "stage of the prosecution" under consideration must, at the very least, involve the physical "presence of the accused," at a "trial-like confrontation" with the Government, at which the accused requires the "guiding hand of counsel." According to the Court a pretrial photographic identification does not, of course, meet these criteria.

In support of this rather crabbed view of the Sixth Amendment, the Court cites our decisions in *Coleman* v. *Alabama,* 399 U. S. 1 (1970), *Massiah* v. *United States,* 377 U. S. 201 (1964), *White* v. *Maryland,* 373 U. S. 59

(1963), and *Hamilton* v. *Alabama,* 368 U. S. 52 (1961). Admittedly, each of these decisions guaranteed the assistance of counsel in pretrial proceedings at least arguably involving the physical "presence of the accused," at a "trial-like confrontation" with the Government, at which the accused required the "guiding hand of counsel." [17] Moreover, as the Court points out, these decisions are consistent with the view that the Sixth Amendment "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel." *Johnson* v. *Zerbst,* 304 U. S. 458, 462–463 (1938). But, contrary to the Court's assumption, this is merely one *facet* of the Sixth Amendment guarantee, and the decisions relied upon by the Court represent, not the boundaries of the right to counsel, but mere applications of a far broader and more reasoned understanding of the Sixth Amendment than that espoused today.

The fundamental premise underlying *all* of this Court's decisions holding the right to counsel applicable at "critical" pretrial proceedings, is that a "stage" of the prosecution must be deemed "critical" for the purposes of the Sixth Amendment if it is one at which the presence of counsel is necessary "to protect the fairness of *the trial itself*." *Schneckloth* v. *Bustamonte,* 412 U. S., 218, 239 (1973) (emphasis added). Thus, in *Hamilton* v. *Ala-*

---

[17] *Coleman, White,* and *Hamilton,* guaranteed the assistance of counsel at preliminary hearings and arraignments. *Massiah* held that incriminating statements of a defendant should have been excluded from evidence when it appeared that they were overheard by federal agents who, without notice to the defendant's lawyer, arranged a meeting between the defendant and an accomplice turned informant. Thus, it is at least questionable whether *Massiah* involved a *"trial-like* confrontation" with the Government.

*bama, supra,* for example, we made clear that an arraignment under Alabama law is a "critical stage" of the prosecution, not only because the accused at such an arraignment requires "the guiding hand of counsel," but, more broadly, because "[w]hat happens there may affect the whole trial." *Id.,* at 54. Indeed, to exclude counsel from a pretrial proceeding at which his presence might be necessary to assure the fairness of the subsequent trial would, in practical effect, render the Sixth Amendment guarantee virtually meaningless, for it would "deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'" *Massiah* v. *United States, supra,* at 204, quoting *Spano* v. *New York,* 360 U. S. 315, 326 (1959) (DOUGLAS, J., concurring); see *Escobedo* v. *Illinois,* 378 U. S. 478, 484–485 (1964).

This established conception of the Sixth Amendment guarantee is, of course, in no sense dependent upon the physical "presence of the accused," at a "trial-like confrontation" with the Government, at which the accused requires the "guiding hand of counsel." On the contrary, in *Powell* v. *Alabama,* 287 U. S. 45 (1932), the seminal decision in this area, we explicitly held the right to counsel applicable at a stage of the pretrial proceedings involving *none* of the three criteria set forth by the Court today. In *Powell,* the defendants in a state felony prosecution were not appointed counsel until the very eve of trial. This Court held, in no uncertain terms, that such an appointment could not satisfy the demands of the Sixth Amendment, for " '[i]t is vain . . . to guarantee [the accused] counsel without giving the latter any opportunity to acquaint himself with the facts or law of the case.'" *Id.,* at 59. In other words, *Powell* made clear that, in order to preserve the accused's right to a fair trial and to "effective and substantial" [18] assist-

---

[18] 287 U. S., at 53.

ance of counsel at that trial, the Sixth Amendment guarantee necessarily encompasses a reasonable period of time before trial during which counsel might prepare the defense. Yet it can hardly be said that this preparatory period of research and investigation involves the physical "presence of the accused," at a "trial-like confrontation" with the Government, at which the accused requires the "guiding hand of counsel."

Moreover, despite the Court's efforts to rewrite *Wade* so as to suggest a precedential basis for its own analysis,[19] the rationale of *Wade* lends no support whatever to today's decision. In *Wade*, after concluding that compelled participation in a lineup does not violate the accused's right against self-incrimination,[20] the Court addressed the argument "that the assistance of counsel at the lineup was indispensable to protect Wade's most basic right as a criminal defendant—his right to a fair trial at which the witnesses against him might be meaningfully cross-examined." 388 U. S., at 223–224. The Court then surveyed the history of the Sixth Amendment, and specifically concluded that that Amendment guarantees "counsel's assistance *whenever* necessary to assure a meaningful 'defence.'" *Id.*, at 225 (emphasis added).

---

[19] See *ante,* at 313–316. In an effort to justify its contention that *Wade* itself in some way supports the Court's wooden analysis of the counsel guarantee, the Court points to the so-called "careful limitation of the Court's language [in *Wade*] to 'confrontations.'" *Ante,* at 315. But *Wade* involved a lineup which is, of course, a "confrontation." Thus, it is neither surprising, nor significant, that the Court interchangeably used such terms as "lineup," "confrontation" and "pretrial identification" as descriptive of the facts. Indeed, the *Wade* dissenters recognized that *Wade* logically applies, not only to lineups, but "to any other techniques employed to produce an identification . . . ." *United States* v. *Wade, supra,* at 251 (WHITE, J., concurring and dissenting).

[20] See *United States* v. *Wade, supra,* at 221–223.

Then, after examining this Court's prior decisions concerning the applicability of the counsel guarantee,[21] the Court stressed once again that a pretrial proceeding is a "critical stage" of the prosecution if "the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." *Id.,* at 227.

The Court next addressed the Government's contention that a lineup is "a mere preparatory step in the gathering of the prosecution's evidence, not different—for Sixth Amendment purposes—from various other preparatory steps, such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like." *Id.,* at 227. If the Court in *Wade* had even the remotest intention of embracing the wooden interpretation of the Sixth Amendment ascribed to it today, it could have rejected the Government's contention simply by pointing out the obvious fact that such "systematized or scientific analyzing" does not in any sense involve the physical "presence of the accused," at a "trial-like confrontation" with the Government, at which the accused requires the "guiding hand of counsel." But the Court offered not even the slightest hint of such

---

[21] See *id.,* at 225–227. The Court's quotation of *Escobedo* v. *Illinois,* 378 U. S. 478 (1964), is particularly instructive:

" 'The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the "right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination" . . . . "One can imagine a cynical prosecutor saying: 'Let them have the most illustrious counsel, now. They can't escape the noose. There is nothing that counsel can do for them at the trial.' " ' " *United States* v. *Wade, supra,* at 226, quoting *Escobedo* v. *Illinois, supra,* at 487–488.

an approach. Instead, the Court reasoned that, in light of the scientific nature of such analyses,

> "the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; *they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial."* *Id.,* at 227–228 (emphasis added).

Finally, after discussing the dangers of misidentification arising out of lineup procedures and the difficulty of reconstructing the lineup at trial, the Court noted that "[i]nsofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him." *Id.,* at 235. The Court therefore concluded that "[s]ince it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid [of counsel] . . . as at the trial itself.'" *Id.,* at 236–237.

Thus, contrary to the suggestion of the Court, the conclusion in *Wade* that a pretrial lineup is a "critical stage" of the prosecution did not in any sense turn on

the fact that a lineup involves the physical "presence of the accused" at a "trial-like confrontation" with the Government. And that conclusion most certainly did not turn on the notion that presence of counsel was necessary so that counsel could offer legal advice or "guidance" to the accused at the lineup. On the contrary, *Wade* envisioned counsel's function at the lineup to be primarily that of a trained observer, able to detect the existence of any suggestive influences and capable of understanding the legal implications of the events that transpire. Having witnessed the proceedings, counsel would then be in a position effectively to reconstruct at trial any unfairness that occurred at the lineup, thereby preserving the accused's fundamental right to a fair trial on the issue of identification.

There is something ironic about the Court's conclusion today that a pretrial lineup identification is a "critical stage" of the prosecution because counsel's presence can help to compensate for the accused's deficiencies as an observer, but that a pretrial photographic identification is not a "critical stage" of the prosecution because the accused is not able to observe at all. In my view, there simply is no meaningful difference, in terms of the need for attendance of counsel, between corporeal and photographic identifications. And applying established and well-reasoned Sixth Amendment principles, I can only conclude that a pretrial photographic display, like a pretrial lineup, is a "critical stage" of the prosecution at which the accused is constitutionally entitled to the presence of counsel.