STATE of Missouri, Plaintiff-Respondent,

v.

Robert Francis GOMILLIA,
Defendant-Appellant.

No. 35343.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Sept. 30, 1975.

Daniel V. O'Brien, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Robert Presson, Asst. Atty. Gen., Jefferson City, Thomas E. Dittmeier, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

KELLY, Judge.

The appellant, hereinafter the defendant, was convicted in the Circuit Court of St. Louis County, Missouri, of Robbery in the First Degree by Means of a Dangerous and Deadly Weapon (§ 560.120 RSMo 1969) on Count I of an Amended Information and on Count II of Assault with Intent to Kill with Malice Aforethought (§ 559.180 RSMo 1969). Having been found by the trial court after an evidentiary hearing to be a Second Offender within the terms of § 556.-280 RSMo 1969, the trial court, rather than the jury, sentenced the defendant to a term of life imprisonment in the custody of the Missouri Department of Corrections on the Robbery charge and to a term of twenty (20) years in the custody of the Department of Corrections on the Assault charge, concurrently.[1] This appeal followed.

Defendant does not challenge the sufficiency of the evidence to sustain a convic-

---

1. The defendant had entered pleas of guilty to two charges of robbery and one charge of carrying a concealed weapon in the Circuit Court of the City of St. Louis; on December 27, 1972, he was sentenced to a term of 20 years in the custody of the Missouri Department of Corrections on each charge, said sentences to be served concurrently.

894

tion on either Count of the Amended Information, but rather contends that the trial court erred in (1) admitting the in-court identification of witnesses John Ellinger, Jr., and Myra Lloyd and (2) admitting into evidence "mug shots" of the defendant and others and permitting them to be passed to the jurors for their inspection.

The facts as found by the jury are that at about 8:15 a. m. on the morning of November 6, 1972, John Ellinger, Jr., was seated in the office of a service station located at 8308 Airport Road in St. Louis County, Missouri, when two black men entered. One of the black men walked towards the service bay and the other, the taller of the two, who was identified at trial as the defendant, approached Mr. Ellinger who was, at the time, talking on the telephone. As he approached Mr. Ellinger the defendant put on a pair of gloves and when approximately three feet from Mr. Ellinger drew a gun and directed Mr. Ellinger to "keep it up." The defendant then walked behind Mr. Ellinger and removed at least $400.00 from the desk top. Mr. Ellinger was then directed to open the cash register and when he did the defendant removed the contents. Mr. Ellinger and David Boll, a fellow employee, were instructed to lie down on the storeroom floor and after they did as ordered, the storeroom doors were closed and Mr. Ellinger heard the front door open and close. Mr. Ellinger then started to pick up the phone from the floor when he heard a noise and looked up to see the defendant returning. The defendant pointed a gun to Mr. Ellinger's head and threatened to kill him. Mr. Ellinger grabbed at the gun and during the following struggle the gun discharged striking Mr. Ellinger in the abdomen. The defendant then made his escape from the premises. At the scene Mr. Ellinger described the defendant as being six (6) feet tall, stocky build and weighing 200 pounds. He said the defendant was wearing a hip length dark tan leather coat, dark trousers and a broad brimmed hat.

On Tuesday, November 7, 1972, two officers of the Berkeley Police Department showed Mr. Ellinger some "mug shots," eight in number, and from these he selected the photo of the defendant as the man who robbed and shot him. All eight of the "mug shots" were offered and admitted into evidence during the course of the trial and then passed to the jurors for their examination. These eight "mug shots" plus three more were also shown to Myra Lloyd, a State's witness, at approximately 3:30 p. m. on November 6, 1972, and out of the group she selected defendant's photo as that of the robber she saw at the scene of the occurrence. The following morning Mrs. Lloyd went to the Berkeley police station at about 10:45 a. m. Mr. Boll was also there. She was shown a lineup of five black men in a well-lighted room in which there was a two-way glass. Two of the men had beards and two had Afro hair-dos. After viewing the lineup she was fairly certain that the center man was the person she had seen at the scene of the hold-up but she asked them to bring the men back in again, viewed the lineup a second time and then was certain that it was the center man she saw at the robbery scene. The "center man" in the lineup was this defendant. The "mug shot" of the defendant was shown to Mrs. Lloyd on February 14, 1973, just prior to her taking the stand and offering her testimony in the trial.

Defendant's first Point Relied On in this court is: "The in-court identifications by witnesses John Ellinger, Jr., and Myra Lloyd violated appellant's right to the due process of law, his right to counsel, and his right to a fair trial." Reference to his motion for new trial causes us to conclude that these are not the same contentions presented to the trial court for there is no reference therein to Mrs. Lloyd's identification testimony and the only reference to Mr. Ellinger's identification testimony is contained in paragraph 8 of defendant's motion, which reads as follows: "8. The Court erred in allowing John Ellinger, the alleged victim to testify as to the defendant's identity, having the (sic) three (3) days

before the start of trial viewed a video-taped line-up without the presence of the defendant or his attorney." Any claim of error not assigned in a motion for new trial in a criminal case is not preserved for appellate review, *State v. Bowens,* 476 S.W.2d 495, 498[5] (Mo.1972), *State v. Henderson,* 510 S.W.2d 813, 821[12] (Mo.App.1974), Rule 27.20(a), and any assignment of error set out in defendant's motion for new trial not briefed in the appellate court is considered abandoned. *Metter v. Janssen,* 498 S.W.2d 581, 583[1] (Mo.App.1973). When preparing briefs on appeal counsel in a criminal case is required to comply with Rule 28.18 providing that, with certain exceptions, Rules of Civil Procedure apply to criminal cases and with the provisions of Rule 84.04(d) that: "The points relied on shall state briefly and concisely what actions or rulings are sought to be reviewed *and wherein and why they are claimed to be erroneous.*" (Emphasis supplied). *State v. Gantt,* 504 S.W.2d 295, 297[1] (Mo.App.1973). Points relied on by an appellant seeking reversal of a conviction should definitely isolate and formulate precise issues to be reviewed, and if that function is observed at all, it should not be relegated to the argument portion of the brief. *State v. Freeman,* 489 S.W.2d 749, 751[1] (Mo.App.1973). It is apparent that defendant's first point raised in his brief filed in this court constitutes no more than a series of legal conclusions and fails to state wherein and why the in-court identification of Mr. Ellinger violated his rights. To glean this information, it is necessary to go to the argument portion of defendant's brief. This court, in *Griffin v. State,* 513 S.W.2d 706, 708 (Mo.App.1974) said: "The appellate courts of this State can no longer afford the luxury of searching the Argument section of appellant's briefs for the purpose of discovering if sufficient particularity might be found therein to enable

them to determine why the orders or judgments of the trial court are erroneous."

Despite the aforesaid infirmities in the manner in which defendant has sought a review of his conviction and their utter failure to preserve anything for review in this court, we have studied his first point and discern that the grounds he argues in the argument section of his brief under this point are directed at what he contends were identification procedures which were suggestive and thereby conducive to mistaken identification amounting to a denial of due process.

With respect to the in-court identification of Mrs. Lloyd the defendant argues that it was tainted, and therefore should have been excluded because of a photographic "display consisting of eleven mug shot photographs exhibited to her at approximately 3:30 p. m. on the afternoon of the robbery" and on February 13, 1973, the day immediately preceding her testimony at trial while in the Prosecuting Attorney's office. From these eleven photographs Mrs. Lloyd selected one—a mug shot of the defendant—as a photo of the larger of the two men whom she observed the morning of the robbery near the entrance to the Town and Country Tire Center. The thrust of defendant's argument is that the photo of the defendant was larger than any of the other ten mug shots and this was therefore suggestive to Mrs. Lloyd. The testimony at trial was that of the 11 photographs, two were a "little larger"—"about an inch bigger"—than the others, and both of these came from the City of St. Louis. One of these larger ones was a photograph of the defendant.[2] In further support of his position, defendant argues that Mrs. Lloyd's description of the larger of the two robbers does not tally with defendant's actual physical characteristics. Mrs. Lloyd gave a description of one of the robbers as over 6

2. It was developed out of the jury's presence by voir dire of Officer Moore that he had obtained defendant's photograph after he had run a record check on the license number on the motor vehicle observed in

the area and found that it was listed in defendant's name. The police officer determined that the City Police Department of St. Louis had a photograph of the defendant on file and he went there to get it.

feet in height, weighing over 200 pounds, stockily built, with no distinguishable facial characteristics. During the defendant's case an employee of the St. Louis County Department of Welfare produced under subpoena issued at the defendant's request, certain records kept in the regular course of the business of the St. Louis County Jail, a photostatic copy identified as the front page of the booking sheet and a photograph of the defendant, both dated November 8, 1972, 9:50 p. m., containing information relative to the defendant. According to the copy of the booking sheet the defendant at that time was 31 years of age five feet ten inches tall, weighed 185 pounds, and was of medium build. There was also a notation that he had "scars on forehead." On the photograph was information that defendant was 70 inches tall and weighed 185 pounds. Both exhibits were offered and received into evidence without objection and later in the trial passed to the jury for their inspection. On cross-examination the witness testified that the information on the booking sheet came from the person being booked, in a question and answer form, and then typed in.

■■■ We are of the opinion that the mere fact that one photo is larger in dimensions by "about an inch" is insignificant, particularly where, as here, more than one of the photos displayed to Mrs. Lloyd was likewise larger by the same amount. We also conclude from a reading of Mrs. Lloyd's testimony, both direct and cross-examination, she had an independent basis for her in-court identification which supports the trial court's admission of same into evidence. On the morning of the robbery Mrs. Lloyd's attention was, in the first instance, called to the presence of the defendant and his accomplice because they were among a group of children at the cross-walk where she was performing her duties as a crossing-guard. As the two men approached among the children she observed that they stopped for just a second in front of the Town and Country Tire Center, a service station, and then proceeded to within two feet of her behind her crossing light and then walked on down to the next telephone pole about twenty feet beyond her. She then directed the children across Airport Road and when she returned to her station the two men were walking back toward the Tire Center and cut across the service station lot towards the entrance to the service station. The last time she saw the two men they were almost to the entrance of the service station. When she was shown the eleven photographs she selected defendant's without any difficulty, but while she thought one of the other photographs looked like a photo of defendant's accomplice, she declined to make an identification from that because of her uncertainty. Two days later, on November 8, 1972, Mrs. Lloyd identified the defendant from a lineup of five men as the taller of the two men she saw the morning of the robbery approaching the entrance to the service station. She also identified the defendant at trial as one of the men and despite a rigorous cross-examination, testing her ability to identify him, persisted in her identification. From the foregoing we conclude that the trial court did not err in allowing the in-court identification of the defendant by Mrs. Lloyd, and we so hold.[3] *State v. Boothe,* 485 S.W.2d 11, 13[2] (Mo. banc 1972), *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

Defendant's attack on Mr. Ellinger's in-court identification is from two directions. Initially he contends that Mr. Ellinger was shown a group of eight photos while under medication in the hospital, and from this

3. Because of *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1972), the photographic presentation of defendant's photo to Mrs. Lloyd on the day prior to her testifying at trial was not viewed with respect to defendant's Sixth Amendment rights, but, rather, as one of the "totality of the circumstances" considered on the question of tainting.

group he, like Mrs. Lloyd, selected defendant's picture because it was larger than the others. He argues that "it was inevitable that Mr. Ellinger would select the suspect with the larger photograph." Officer Moore testified that on November 7, 1972, he visited Mr. Ellinger at the Christian Northwest Hospital in the intensive care ward at which time he displayed to Mr. Ellinger eight photos. Of these eight, some of them were the same he had previously shown to Mrs. Lloyd, but he had subtracted four photos from the eleven shown to Mrs. Lloyd and added one more. At trial, however, only seven of the eight photos the police officer had shown Mr. Ellinger were on hand. Among this number of photos, three were larger than the others. One of the larger photos was the one he added after subtracting four shown to Mrs. Lloyd. Prior to showing Mr. Ellinger these photos he had to obtain permission from a doctor on the floor. At that time Mr. Ellinger appeared "okay," but Mr. Ellinger told him that he wasn't feeling real good though. When asked if Mr. Ellinger "was bright," the officer replied that he didn't know what defense counsel meant by "bright," but "(h)e wouldn't be bright." Mr. Ellinger told him that "they had been giving him some needles" for pain. Out of the eight photos the police officer showed Mr. Ellinger he picked one, the defendant's, as a picture of the man who shot him.

■ As we have said in ruling on the defendant's attack on Mrs. Lloyd's in-court identification, the fact that of the eight pictures displayed to Mr. Ellinger three were larger in size than the other five, in the absence of any other evidence of suggestiveness or impropriety in the conduct of the photographic display to Mr. Ellinger, is insignificant and would not require the exclusion of Mr. Ellinger's in-court identification. Nor is the evidence in the record relative to the fact that Mr. Ellinger might have been under some medication, either alone or in conjunction with the size of the photographs, sufficient to cause this court to find that the trial judge erred in admitting into evidence his in-court identification of the defendant. There was sufficient evidence, as we shall hereinafter suggest, from which the trial court could conclude that Mr. Ellinger's in-court identification was based on a source independent of the photographic display and was not weakened by the fact that he was under medication at the time.

Mr. Ellinger first observed the defendant and another man enter the door of the building while he was counting the weekend's receipts. The first man to enter the building was pulling on a pair of gloves as he came in and pulled a gun when he was within three feet of Mr. Ellinger, who was then talking with his boss on the telephone. This man, identified by Mr. Ellinger as the defendant, told him to "just keep it up" and then walked behind Mr. Ellinger and patted him down. The defendant then started picking up the money on the desk which Mr. Ellinger had been counting, and then ordered him to open the cash register. When this was done the defendant took all of the money out of the cash register. Mr. Ellinger was then ordered into the back room of the service station where one of his employees, Mr. Boll, was already laying down with his face to the floor, while the second man who had entered the service station was standing holding a gun on him. Mr. Ellinger then laid down also facing upwards and then moved over and laid face down, and then the defendant left the room for a time while the other man remained with them. Mr. Ellinger and Mr. Boll were told to lie down and remain there until they left, and then the two robbers closed the door and were heard opening and closing the front door. Mr. Ellinger got up and opened the door to his office and as he was reaching to get the phone off the floor, he heard a noise, glanced up and saw the defendant coming at him, and declaring that he was going to blow his head off. The defendant then pointed the gun at his head, and Mr. Ellinger reached up and grabbed the gun.

They grappled for the gun until it was in the vicinity of Mr. Ellinger's navel when it went off. The defendant then turned around and ran out of the service station. Mr. Ellinger got up, went to his desk and obtained his revolver from the desk drawer and then pursued the defendant as he fled westwardly. Mr. Ellinger fired three shots at the defendant as he fled across the parking lot, before he fainted from the wound he had sustained. The entire time of the robbery took five to ten minutes. At the scene, while he was "passing out" Mr. Ellinger described the defendant to a police officer by the name of Ransom. He told the police officer that the defendant was wearing a brown coat, that he was taller than himself (he is 5 feet 10 inches tall), about 200 pounds, stocky build, although he was having difficulty recalling just exactly what description he did give the police officer because of his physical condition at that time. Also, at trial, he testified that his in-court identification was based upon his observations at the time of the robbery rather than on the photograph. From the facts set out herein, it is clear that the witness had sufficient opportunity to view the defendant at the time of the commission of the crime, his attention at that time was directed to the defendant, his description of the defendant was within reason, and he displayed no uncertainty when the photographs were shown to him while confined to the hospital the day following the event. *Neil v. Biggers*, supra.

Defendant's second assault on the State's handling of the identification procedures is directed at a showing of a video-tape of the lineup of November 8, 1972, shown to Mr. Ellinger on February 12, 1973, at the Berkeley Police station—just two days prior to the trial date. Between the time Mr. Ellinger saw the photo of the defendant in the hospital on November 7, 1972, and February 12, 1973, there is evidence in the record that Mr. Ellinger never saw the defendant. On February 12, 1973, at the request of Officer Moore, a detective on the

Berkeley police force, the Identification Officer for the Berkeley Police Department, Officer Terrance Carty, showed Mr. Ellinger a video-tape of the lineup conducted on November 8, 1972, attended by Mrs. Lloyd. Neither the defendant nor his counsel were notified of this procedure nor were they present. At this showing the victim, Mr. Ellinger, selected the middle man in the five man lineup as the man who robbed him and his identification was not, he testified, based upon the video-tape but on "the defendant himself." He later testified that his identification in court was based on his vision of the "gentleman at the time he shot me." and was not based on the photographs nor on the video-tape. Defendant argues that even if this court does not conclude that his due process rights were violated, then we must decide the question whether his Sixth Amendment rights to assistance of counsel were violated by this procedure.

In ruling this point it is pertinent to note that defendant's oral motion to suppress any identification testimony did not come until the morning of trial and the trial court was of the opinion that it came too late. Nevertheless, the trial court advised counsel for the defendant that if it appeared to him during the trial that the lineup identification was improperly obtained he would rule on it at that time and adequately protect the defendant's constitutional and other rights. After hearing the evidence, the trial court ruled, despite defendant's contentions to the contrary, that he found that "beyond a reasonable doubt the in-court identification made by the witness Ellinger was not tainted or biased in any way by the out of court exhibition to him either of the photographs or of the video-tape."

With respect to this issue, the State in its brief agrees that defendant's counsel should have been present for the showing of the video-tape to Mr. Ellinger. It reasons that if a live lineup had been held at the time of the showing of the video-tape counsel for

the defendant would have had to have been present since this viewing was after the defendant had been formally charged. Its position is, however, that the State did not attempt to introduce evidence of the lineup identification by Mr. Ellinger, but the evidence came out in cross-examination of the witness and the issue before us then is not one of admissibility of the out of court lineup identification by Mr. Ellinger, but rather, whether there is an independent basis for the in-court identification which will overcome any taint which might have resulted from the video-taped lineup identification.

Defendant relies on *Cox v. State,* 219 So.2d 762 (Fla.Ct.App.1969), but, as the State points out in its brief, in *Cox* the evidence of the video-taped lineup "surreptitiously arranged" in the absence of defendant or his counsel came in during the State's direct examination of one of its police officer witnesses. There are other distinguishing features between the two cases also. In *Cox,* the video-tape was made of the defendant while he was being "booked" at the jail and after the defendant had been advised of his Miranda rights and had stated that he did not want to talk until he had first spoken to an attorney. The video-tape showed the defendant moving about, talking and answering questions concerning his height, color of hair, name and color of eyes. *Cox,* it must be noted, was decided on February 11, 1969, prior to *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, which was decided on June 7, 1972. In *Kirby* the Supreme Court held that a show-up after arrest, but before the initiation of any adversary criminal proceeding, unlike the post-indictment confrontations of *Gilbert* and *Wade,* was not a criminal prosecution at which the accused, as a matter of absolute right, was entitled to counsel. Thus, the basis for the *Cox* decision— "What the police could not have done directly, they should not be allowed to do indirectly through the miracles of modern science"—was invalidated.

However, we are here confronted with a different situation than either *Cox* or *Kirby.* The video-tape in this case was made prior to the initiation of any adversary proceeding as those terms are used in *Kirby,* but presented to a witness after the initiation of adversary proceedings and within two days of the commencement of trial. The State concedes that under these circumstances defendant's counsel should have been notified and afforded the opportunity to be at the video-taped showing of the lineup to perform the same functions assigned him had this been a live lineup. We do not then have to decide that question here.

Assuming arguendo, that counsel's attendance at the video-taped lineup in this case was necessary under *Wade* and *Gilbert,* the per se exclusionary rule announced in those cases is applicable only to the evidence of the admissibility of the lineup evidence in the prosecution's case unless we find that there was a taint to Mr. Ellinger's in-court identification which could not be overcome by an independent source to support his in-court identification.

■ The fact of the showing of the video-taped lineup to Mr. Ellinger came out during the cross-examination of the witness conducted by defense counsel. At that time defendant's counsel claimed surprise and denied any knowledge of this event. Fortuitously, this occurred at a time the trial court had chosen to take a noon recess, and a discussion out of the presence of the jury ensued. Defense counsel moved to strike the identification testimony of this witness on the grounds that a lineup was held without either his client or defense counsel being informed of it or being present. The trial court advised the defendant's counsel that he understood the motion and it was denied. Arrangements were then made for defense counsel to view the video-tape prior to continuing his cross-examination of the witness. Defense counsel viewed the video-tape lineup and immediately after the trial was resumed defense counsel continued his

cross-examination of Mr. Ellinger relative to the showing of the video-tape lineup to him on February 12, 1973, including whether he made any identification off of the video-tape. Under these circumstances, the exclusionary rule announced in *Wade* has been waived by reason of the defendant himself putting into evidence the very evidence he is complaining about on appeal. Up to the time he developed that the witness had identified defendant in the video-taped lineup, all the jury was aware of by the cross-examination was that the witness had viewed a video-taped lineup on the prior Saturday at the Berkeley Police Department. It was the defendant who developed that Mr. Ellinger picked the defendant from the five men in the lineup as the one who robbed him. He cannot now be heard to complain.

We also conclude that, as we have stated earlier in this opinion, Mr. Ellinger had an independent source of identification apart from his viewing of the video-taped lineup which supports the trial court's ruling on this issue. We rule this point against the defendant.

The second point raised by the defendant is that the trial court erred in admitting into evidence State's Exhibits 3 and 8 through 17, for the reason that his character was thereby improperly put in issue and he was then deprived of due process and a fair trial. The State responds that these exhibits were relevant to the identification of the defendant, and were, therefore, properly admitted. As too frequently happens, we are not favored by either of the parties to this appeal filing separately the original exhibits in this court by stipulation or, where it is impracticable to incorporate the exhibits in the transcript, by depositing them with the clerk of this court pursuant to Rule 81.15. What notations, if any, were on these photographs when they were admitted into evidence and passed to the jury we do not know, but from the record we deduce that they were marked so that whatever the notations were, they were concealed from the eyes of the jurors. One

thing we do know though, is that the question of the identity of the defendant as one of the two robbers was the crucial issue in the case.

Defendant bases his contentions in this court on the grounds that these exhibits were inadmissible as evidence in this case because they were selected from the Berkeley Police files, that they therefore conveyed to the jury information that the defendant had a prior criminal record, and thereby put the defendant's character into issue when he had not.

We gather from the record, without the benefit of the photographs themselves, that Exhibit 3 was a photograph of the defendant obtained from the Metropolitan St. Louis Police Department on November 7, 1972, after he had been taken into custody by a member of the St. Louis Metropolitan Police Department following a license check. Exhibits 11 through 16 and 18 were mug shots of other persons obtained either from the records of the Berkeley Police Department or the St. Louis Metropolitan Police Department for the purpose of a photographic display in an effort to learn whether any of the witnesses could identify one or more of those portrayed in the photos as one of the robbers. These eight exhibits were shown to Mr. Ellinger. Mrs. Lloyd was shown Exhibits 3, and 8 through 17, and selected from this number Exhibit No. 3 as a photo of the defendant, one of the robbers she had observed at the scene the day of the robbery.

Defendant, in his brief, acknowledges that *State v. Donnell*, 430 S.W.2d 297 (Mo. 1968), held that out-of-court identification by means of police photographs was a proper part of the case where the identity of the accused was in issue, but he would distinguish *Donnell* on the ground that there the photographs were not passed to the jury for their inspection.

Defendant's counsel, in his summation to the jury, called to the attention of the jury the vital issue in this case when he said: "The identification is the basis of this law-

suit. And I say to you, you don't have an identification because . . ." By reason of this fact, the identification of the defendant as one of the robbers testified to by both Mr. Ellinger and Mrs. Lloyd made their testimony concerning the out-of-court photographic identification relevant and also made the photographs obtained from the two police departments relevant and material on the issue of the accuracy of their identifications. *State v. Jenkins*, 516 S.W.2d 522, 526[10, 11] (Mo.App.1974).

Finally, the record is devoid of any objection by the defendant when these exhibits were passed to the jury for their inspection at the close of the State's case. The only request made by defendant's counsel at that time was that all of the photographs be passed to the jury in a group.

We rule this point against the defendant.

We have examined those portions of the record as required by Rule 28.02 and find them to be sufficient.

The judgment of the trial court is affirmed.

CLEMENS, P. J., and STEWART, J., concur.