HUDSON, J. (dissenting).
As the court acknowledges today, we recognized a limited right to counsel in Friedman v. Commissioner of Public Safety because of the "critical and binding decision" drivers must make when asked to submit to chemical testing under Minnesota's implied-consent law. 473 N.W.2d 828, 832 (Minn. 1991). Although appellant Jennifer Rosenbush was faced with the same decision as the driver in Friedman , the court nevertheless holds that Rosenbush did not have the limited right to counsel that we recognized in Friedman because police obtained a search warrant to collect a blood sample from her. Because I conclude that Friedman applies when an individual is read the implied-consent advisory and asked to submit to a blood test pursuant to a search warrant under Minn. Stat. § 171.177 (2018), I would suppress the results of Rosenbush's blood test.[1] I therefore respectfully dissent *100 from the court's opinion and would reverse the court of appeals.
In Friedman , we explained that the right to counsel under Article I, Section 6, of the Minnesota Constitution attaches at all "critical stages" of a criminal prosecution. 473 N.W.2d at 833. Critical stages include events where "the accused require[s] aid in coping with legal problems or assistance in meeting his adversary," and "those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel." Id. (citations omitted) (internal quotation marks omitted). We determined in Friedman that a request for chemical testing under Minnesota's implied-consent law created exactly such a situation. Id. at 835. Specifically, we focused on a driver's need for an "objective advisor" to explain "the alternative choices" and different "legal ramifications" arising from the decision to refuse or allow a chemical test in this situation. Id. at 833. We reasoned that "[a] driver must make a critical and binding decision regarding chemical testing, a decision that will affect him or her in subsequent proceedings," id. at 832, and that when making such a decision, "[a]n attorney, not a police officer, is the appropriate source of legal advice," id. at 833. In other words, " '[o]ne's dignity, the dignity of a free citizen to determine one's rights and obligations through consultation with a trusted counselor rather than one's accusers, is gravely intruded upon' " without a limited right to counsel in this context. Id. at 834 (quoting Nyflot v. Comm'r of Pub. Safety , 369 N.W.2d 512, 521 (Minn. 1985) (Yetka, J., dissenting)).
Just last year, in State v. Hunn , 911 N.W.2d 816 (Minn. 2018), we reiterated the scope and rationale of Friedman . We first explained that "[t]he legal ramifications of the decision to submit (or not submit) to chemical testing after the advisory reading are significant." Id. at 820. While "consenting may provide law enforcement with the evidence necessary to secure a conviction[,] ... refusing will automatically result in a mandatory license revocation, and may still result in a criminal DWI conviction." Id. And "it may not be clear to a driver faced with the advisory whether the consequences for consenting or refusing will be worse." Id. We affirmed that this "unique decision" and the "consequences that come with the reading of the advisory" are the reasons that drivers have a limited right to counsel when chemical testing is requested under the implied-consent law. Id. at 819-20.
Here, Rosenbush was faced with the "unique decision" required to trigger the limited right to counsel announced in Friedman . Like the driver in Friedman , Rosenbush was read the applicable implied-consent advisory. See Minn. Stat. § 171.177, subd. 1. And like the driver in Friedman , Rosenbush had two options: submit to a chemical test and give the police potentially incriminating evidence, or refuse and have her license automatically revoked and potentially be convicted of DWI. See Minn. Stat. §§ 169A.20, subds. 1, 2(2), 171.177, subd. 4 (2018). In fact, the stakes for Rosenbush were even higher than those faced by the driver in Friedman because test refusal is now a criminal offense in its own right.[2] See Minn. Stat. § 169A.26 (2018) (making a first-time test refusal a gross misdemeanor). Thus, because Rosenbush faced the same unique decision as the driver in Friedman , she *101 should be afforded the same limited right to counsel.
But today, the court holds that police can deprive drivers of the limited right to counsel whenever they obtain a search warrant for chemical testing. Under the court's reasoning, because every individual who is the subject of a warrant must decide whether to comply with the warrant or suffer a penalty for refusal, deciding whether to comply with a warrant is not a "unique decision." In the context of our implied-consent law, however, the analysis is not that simple.
It is true that an individual who is the subject of a search warrant faces a consequence for noncompliance. But the implied-consent law is sui generis. This is because the implied-consent law explicitly forbids law enforcement from conducting a chemical test if the driver refuses. Minn. Stat. § 171.177, subd. 13 ("If a person refuses to permit a blood or urine test as required by a search warrant ... then a test must not be given."); see also Minn. Stat. § 169A.52, subd. 1 (2018) (same prohibition for breath tests).
In contrast, refusal to submit to a search warrant in any other context does not prohibit the police from executing the warrant and obtaining the evidence they are authorized to seize. In fact, police are permitted to use reasonable force in the face of a refusal to comply with a warrant in every other context. See Minn. Stat. § 609.06, subd. 1(1)(b)-(c) (2018). Thus-in a white-collar criminal investigation, for instance-an individual's "choice" in deciding whether to comply with a warrant is not the same as a driver's choice in deciding whether to submit to chemical testing under the implied-consent law. Regardless of the presence of a warrant, the implied-consent law continues to require drivers to make a unique decision and, therefore, should trigger the limited right to counsel announced in Friedman . Indeed, as Rosenbush argued to this court, "[i]f ever someone needed the assistance of counsel, it would be to explain that despite a court order compelling a police officer to secure a sample of their blood, they could render the order toothless simply by uttering the word 'no.' "
The court also reasons that the presence of a search warrant ameliorates the concerns that we articulated in Friedman . I disagree. Search warrants protect the Fourth Amendment right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. They protect "personal privacy and dignity." Schmerber v. California , 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ; see also Birchfield v. North Dakota , --- U.S. ----, 136 S. Ct. 2160, 2181, 195 L.Ed.2d 560 (2016) ("Search warrants protect privacy ...."); Winston v. Lee , 470 U.S. 753, 758, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) ("The Fourth Amendment protects 'expectations of privacy ....' " (quoting Katz v. United States , 389 U.S. 347, 362, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) )). The right to counsel, on the other hand, "protect[s] the lay person who 'lacks both the skill and knowledge' to defend him- or herself." Friedman , 473 N.W.2d at 833 (quoting Powell v. Alabama , 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ). The guarantee of counsel at all critical stages of a prosecution ensures that an accused's right to a fair trial is not "an empty right." United States v. Wade , 388 U.S. 218, 225, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Because the Fourth Amendment and the right to counsel protect fundamentally different interests, the presence of one does not negate the utility of the other. Cf. Deegan v. State , 711 N.W.2d 89, 98 (Minn. 2006) ("[O]ur view, under the Minnesota Constitution, [is] that a defendant's access to the other protections afforded in criminal proceedings *102 cannot be meaningful without the assistance of counsel.").
Further, the presence of a search warrant plainly does not address many of the central concerns animating our holding in Friedman . We noted that drivers will be confused about the "legal ramifications" of their decisions under the implied-consent law and that an attorney "could explain the alternative choices." Friedman , 473 N.W.2d at 833. We were concerned that drivers were being asked to make "a critical and binding decision regarding chemical testing, a decision that will affect him or her in subsequent proceedings," id. at 832, and determined that drivers should be able " 'to determine [their] rights and obligations through consultation with a trusted counselor rather than [their] accusers,' " id. at 834 (quoting Nyflot , 369 N.W.2d at 521 (Yetka, J., dissenting)).
None of these concerns are resolved or ameliorated simply because the police have secured a search warrant. Drivers will still be left without guidance about the legal ramifications of their decision and will still have to make a critical and binding decision that will affect them in a subsequent DWI prosecution. A search warrant will not give drivers "aid in coping with legal problems," and will not stop their decisions from "impair[ing] defense on the merits" if they submit to testing. Id. at 833 (citations omitted) (internal quotation marks omitted). In my view, Rosenbush was in no different position than the driver in Friedman , and thus, she was entitled under the Minnesota Constitution to exercise her limited right to counsel.
The court is right that a search warrant aids a driver in " 'meeting his adversary,' " Friedman , 473 N.W.2d at 833 (quoting United States v. Ash , 413 U.S. 300, 313, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) ), because a neutral magistrate has determined there was probable cause to issue the warrant. But this concern was not the driving force behind our recognition of a limited right to counsel in Friedman . We confirmed in Hunn that Friedman was premised on the "unique decision" that drivers read the implied-consent advisory face when deciding whether to submit to chemical testing. 911 N.W.2d at 819-20. Accordingly, the presence of a search warrant does not support the court's conclusion that a limited right to counsel is unnecessary when police obtain a search warrant.
Last, the court asserts that changes to the Minnesota Impaired Driving Code have made a driver's choice less meaningful than it was when we decided Friedman . According to the court, because test failure and test refusal have similar criminal penalties, drivers no longer need counsel to explain the legal ramifications of either option. This is a faulty premise. There is still a meaningful difference between "the alternative choices," Friedman , 473 N.W.2d at 833, and thus, a need for counsel.
As the court notes, first-time test refusal is a gross misdemeanor and first-time test failure is a misdemeanor when no aggravating factors are present. See Minn. Stat. §§ 169A.26 -.27 (2018). But while these offenses might sound similar, they carry significantly different penalties. A driver found guilty of a misdemeanor may be sentenced to 90 days in jail and given a $1,000 fine. Minn. Stat. § 169A.03, subd. 12 (2018). A driver found guilty of a gross misdemeanor, on the other hand, is subject to 1-year imprisonment and a $3,000 fine. Id. , subd. 8 (2018).
Similarly, the severity of a driver's license revocation is different based on whether that driver failed or refused a test. A driver who submits to a test but fails is subject to a 90-day license revocation if no aggravating circumstances are present.
*103 Minn. Stat. § 169A.52, subd. 4(a)(1) (2018). That same driver who refuses a test is subject to a 1-year revocation. Id. , subd. 3(a)(1) (2018).
Thus, drivers must make a decision between two meaningfully different choices: comply with a test and risk failing, which could result in up to 90 days in jail and a 90-day license revocation; or refuse and almost certainly receive a test-refusal conviction, which carries a penalty of up to 1 year in jail, as well as a 1-year license revocation under the implied-consent law. Yet the advisory gives drivers none of this information. Drivers are told only that "refusal to submit to a blood or urine test is a crime." Minn. Stat. § 171.177, subd. 1. But the court's decision today deprives drivers of the ability to consult with an attorney who could explain these different penalties. As we explained just last year in Hunn , "[t]he legal ramifications of the decision to submit (or not submit) to chemical testing after the advisory reading are significant." 911 N.W.2d at 820. And "it may not be clear to a driver faced with the advisory whether the consequences for consenting or refusing will be worse." Id. These concerns are as real today as they were when we decided Friedman and Hunn , and therefore, drivers such as Rosenbush should have a limited right to counsel as well.
For the above reasons, I conclude that the presence of a search warrant should not deprive drivers of the limited right to counsel recognized in Friedman . Minnesota law explicitly gives drivers the choice to refuse to submit to a warrant, see Minn. Stat. § 171.177, subd. 13, but it also criminalizes the exercise of that choice and subjects a driver to automatic license revocation, see Minn. Stat. §§ 169A.20, subd. 2(2), 171.177, subd. 4. Thus, drivers read the implied-consent advisory and asked to submit to chemical testing pursuant to a warrant face the same decision as the driver in Friedman , and consequently, "the Minnesota Constitution protects the individual's right to consult counsel when confronted with this decision." 473 N.W.2d at 833. Accordingly, I would reverse the court of appeals and affirm the district court's suppression of Rosenbush's blood-test results.

Although I conclude that the results of Rosenbush's blood test should be suppressed, my conclusion has nothing to do with the behavior of the sheriff's deputy in this case. To the contrary, the deputy followed the correct procedures under the newly enacted law, read the advisory as he was supposed to, and properly responded to Rosenbush's distressed mental state. In particular, he noticed that Rosenbush had recent cuts on her wrists, inquired about them, called a crisis center for advice, and arranged for Rosenbush to be taken to a hospital for a mental health evaluation. Thus, while I would suppress the results of Rosenbush's blood test, I also note that the deputy's behavior in this case appears to have been commendable.

When Friedman was arrested on March 12, 1989, test refusal carried no criminal penalty. See Minn. Stat. § 169.121, subd. 1 (1988).