

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOE ANTONY CABRAL, | § | No. 08-19-00128-CR |
| Appellant, | § | Appeal from the |
| v. | § | 409th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20180D01243) |

**O P I N I O N**

A jury convicted Appellant, Joe Antony Cabral, of murder and sentenced him to 42 years' imprisonment. On appeal, he raises two issues: whether the State purposefully destroyed "material exculpatory evidence" or alternatively "potentially useful evidence" which in turn would allow for the admission of a substitute for that evidence; and (2) whether the trial court violated Appellant's Sixth Amendment rights when it conducted a pretrial proceeding without his counsel present. Because we conclude that the issues do not warrant relief, we affirm the trial court's judgment.

# I. BACKGROUND

Appellant met the victim, Zachary McGuire, when they were both stationed and served in the same Army unit at Fort Bliss. Several hours before the murder, Appellant and McGuire signed a lease to rent an apartment together. The property manager described that the two men acted as would a romantic couple when they applied to rent the apartment, and the assistant manager recounted that the men appeared to get along well the day they moved in.

A neighbor, James Litty, saw Appellant and McGuire pull into the apartment community together and enter their residence. Litty later heard a gunshot. He went outside, saw Appellant's apartment door open, and heard Appellant on the phone repeating, "Yes, sir. Yes, sir." Litty peered inside and saw a body lying on the floor and Appellant standing, talking on the phone.

Litty went to the body, lifted paper towels that had been applied to the victim's head, and saw a bullet hole. Although he knew McGuire was dead, he continued to apply pressure to the wound as Appellant spoke with the 911 operator. Appellant told Litty that McGuire shot himself.

Litty grabbed a handgun that he noticed to his left and cleared the weapon. He asked Appellant if there were any other firearms in the apartment, and Appellant pointed towards another handgun that Litty also cleared. Litty did not want loaded firearms in the apartment, and moved the weapons away from Appellant because he was concerned by Appellant's "panicked and frantic" "vibe."

When law enforcement arrived El Paso Police Officer Derek Gutierrez asked Appellant if anyone else was in the apartment and Appellant responded, "My roommate. Please help him. He shot himself." Officer Gutierrez was shocked to later overhear Appellant tell Sergeant Jurado that he shot his roommate. After Sergeant Jurado advised Appellant of his *Miranda*[1] rights, Appellant

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

voluntarily stated that McGuire pulled out a gun while the two were wrestling, so he pulled out a gun as well. Appellant told Officer Gutierrez that he shot McGuire because he was scared.

## A. The Physical Evidence

El Paso County Deputy Medical Examiner Janice Diaz Cavalliery concluded that McGuire died by homicide--a gunshot wound to the head. Stippling around the entrance wound near McGuire's left ear indicated the firearm that shot him was discharged between three and six feet from his body. The bullet entered near McGuire's left ear, fractured his skull, and came to a stop at the right side of his skull, traveling horizontal and slightly forward, from left to right. McGuire also suffered an abrasion to his abdomen. McGuire's blood toxicology was negative for common prescription and illicit drugs.

A Crime Scene Unit officer pointed to several characteristics of blood pattern evidence that indicated McGuire was not standing when he was shot: (1) the low height and directionality of blood stains on the wall; (2) the flow of bloodstains on McGuire's face indicated that the body had remained in the same position; (3) blood flowed backwards from the gunshot wound towards the back of the top of McGuire's head, while no blood traveled down towards McGuire's chin; and (4) blood spatter on McGuire's shoe indicated he may have been pinned to the ground when he was shot. Bloodstains on McGuire's left hand demonstrated that hand was not clutching Appellant's shirt at the time Appellant shot him, as Appellant ultimately claimed in his statement to law enforcement. Bloodstains on McGuire's right hand further indicated McGuire was not holding a firearm in that hand at the time he was killed.

## B. Appellant's Recorded Interview with Law Enforcement

The State played a recording of Appellant's post-*Miranda* custodial interview. The interview demonstrated subtly different versions of the events that day. Appellant first told law enforcement that while he was putting up a shower curtain, he gave McGuire a hug and asked if

3

McGuire was happy about the new apartment. The hug evolved into the two men wrestling "MMA" style, where they "tr[ied] to pin each other." Appellant speculated that McGuire was angry because Appellant accidentally spilled McGuire's milkshake earlier that day.

Appellant recounted that after the wrestling, he disassembled and re-assembled his firearm. With his weapon in hand, he called out "McGuire" in a female voice that annoyed his roommate. McGuire said "shut up," and aimed a loaded handgun at him.[2] Appellant "[did not] know if it was a joke," but he pulled his weapon because he was scared. McGuire "just ke[pt] it up," so Appellant "panicked, closed [his] eyes, and just shot." Appellant believed "one word"--saying "McGuire" in a female voice--"pissed him off," because a girl broke McGuire's heart. Following the shooting, McGuire convulsed as blood ran from his mouth and nose, and the neighbor ran in as Appellant turned McGuire on his side. Appellant applied paper towels and pressure to McGuire's wound while the neighbor cleared both firearms.

When Appellant recited the story again, he added that he pulled his weapon after asking McGuire twice to drop his. Appellant also provided conflicting statements concerning whether he and McGuire planned on sleeping in the apartment the night of the murder.

Appellant then explained that he inserted a magazine clip into his firearm when he saw McGuire holding a gun. Appellant "barely walked up to [McGuire] and told him to stop," and shot after McGuire did not lower the weapon. By relating his recollection of the events, Appellant was not asking to "walk away from here," and was "not asking for forgiveness." He understood he was "getting in trouble" because he "really messed up," and would "face the consequences."

Thereafter, Appellant told law enforcement that "basically, just about everything [he previously said] was true." After the two men wrestled, McGuire held his unloaded firearm in his

---

[2] Appellant owned a nine-millimeter Smith & Wesson handgun, and McGuire owned a Ruger. McGuire held his pistol with his right hand.

4

hand while he texted. Appellant readied his weapon and moved towards McGuire. Appellant "shot him, panicked, then obviously, [will] get punished for it."

Appellant next told the investigator that the men drew their weapons after Appellant yelled that McGuire was an "asshole" and he associated McGuire with transexuals. As Appellant described:

> We get up close. He grabs my shirt. I grab his shirt. His right--his left hand is grabbing my shirt. My left hand is grabbing his. Pull each other close. He has his gun towards my head. I have mine towards his head . . . and that's when I panicked. Pulled the trigger.

Appellant then explained that the men drew their weapons because he "made [a] terrorist joke" to a non-commissioned officer that got him "kicked out of the Army almost." Appellant said that he was dishonorably or administratively separated, which "ticked me off. And it ticked [McGuire] off pretty good, too. That's when we both were at each other, and so I pulled the trigger."

Appellant denied that he previously told anyone that McGuire shot himself--including law enforcement, the neighbor that assisted, or the 911 operator. Appellant was also positive that he shot McGuire while his roommate was standing upright. When asked about his varying recollections, Appellant explained, "I wasn't lying. I was just saying that he didn't aim the weapon at me, but I just kept certain truth [sic] out of it." He apologized for telling law enforcement versions of the shooting that were not accurate.

## C. Appellant's Testimony

Appellant testified at trial. He told the jury that he did not "necessarily lie[]" in his recorded statement to law enforcement, but "didn't tell the full truth." Shortly before shooting McGuire, Appellant explained that he sought treatment for homicidal ideations, suicidal ideations with a plan, alcohol abuse, depression, paranoia, and auditory hallucinations. Appellant got an apartment with McGuire because he was being separated, or kicked out, of the Army.

5

During his testimony, Appellant provided a final account of the shooting. On the day of the homicide, he called out "McGuire" in a female voice, and McGuire responded that Appellant was a terrorist. Appellant then accused McGuire of having relations with a transvestite, and McGuire pointed his gun at Appellant. Appellant grabbed his gun from the kitchen counter and asked McGuire to put his weapon down. McGuire told Appellant to "shut up." Appellant pulled the slide back and walked towards McGuire as he twice asked McGuire to put the weapon down. McGuire pointed his gun at Appellant's temple with one hand and grabbed Appellant's shirt with the other. Appellant lifted his hand, closed his eyes, and shot. McGuire was standing when Appellant shot him. Appellant claimed he did not intend to kill McGuire, but was afraid. Appellant testified that he did not tell law enforcement or anyone else that McGuire shot himself. Appellant wanted to kill McGuire "out of fear" that McGuire was going to shoot him.

**D. The Disputed Evidence**

Appellant's first issue on appeal focuses on entries in McGuire's diaries. Pursuant to Army regulations, United States Lieutenant Dominik Mariutto inventoried McGuire's personal effects after the murder and closed the military side of the investigation. Lieutenant Mariutto discovered three journals in McGuire's on-base living quarters. McGuire's name was on the cover of two, and all three journals were written in similar handwriting. The contents discussed killing certain ethnic and religious groups, as well as "mentally and physically disabled people." The writings also mentioned "stabbing someone with a spoon."

Lieutenant Mariutto spoke to El Paso Police Department Detective Joe Ochoa about the journals, who came to investigate, looked through the writings for several minutes, but did not take possession of them. Because the Army Criminal Investigation Division also "wanted nothing to do with the journals," Lieutenant Mariutto destroyed them along with other items that could not be sent to McGuire's family. Lieutenant Mariutto testified that he told Detective Ochoa that the

6

journals would be destroyed if law enforcement did not take them. A month after he closed out his report, Lieutenant Mariutto received an email from an El Paso police officer asking if he still had the journals. He responded that the journals were destroyed. Lieutenant Mariutto did not have a copy of that email; he deleted the communication, and he did not recall who sent the request.

### E. The Jury Charge and Verdict

The jury was asked whether Appellant committed murder, or alternatively, committed the lesser included offense of manslaughter. The jury was also instructed on the law of self-defense. The jury found Appellant guilty of murder, as charged in the indictment. The jury assessed a 42-year sentence. Following his conviction, Appellant brings two issues for our review.

## II. TESTIMONY CONCERNING JOURNALS

Appellant's first issue argues that the trial court should have permitted testimony concerning journals that the Army found in McGuire's living quarters, because the State violated his due process rights in allowing the destruction of "material exculpatory evidence" or alternatively "potentially useful evidence." Appellant contends that law enforcement reviewed the journals, and consciously decided in bad faith not to collect the evidence that officers knew established his theory of self-defense and showed that McGuire was the first aggressor.

The State violates a defendant's due process rights by failing to disclose or suppressing material exculpatory evidence, irrespective of the prosecution's good or bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547 (2004), *citing Brady v. Maryland*, 373 U.S. 83 (1963). The State's constitutional duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). But the failure to preserve "potentially useful evidence" does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The Texas Court of Criminal Appeals has stated that, under United States Supreme Court

7

jurisprudence, "*Brady* addresses exculpatory evidence still in the government's possession. *Youngblood* and *Trombetta* address cases in which the government no longer possesses the disputed evidence." *Little v. State*, 991 S.W.2d 864, 866 (Tex.Crim.App. 1999).

Appellant's brief relies on the Court's decision in *Arizona v. Youngblood* which addresses the due process implications when law enforcement fails to collect potentially material exculpatory evidence that later becomes unavailable to the defendant. 488 U.S. at 58 (finding no due process violation for the failure of law enforcement to refrigerate a child sodomy victim's clothing which rendered the semen and fluids on the clothing useless for forensic analysis). Appellant's complaint on appeal therefore falls squarely within the body of constitutional due process law governing the preservation of evidence.

While the State asserts that the issue fails on the merits, it first argues that Appellant did not comply with Texas Rule of Appellate Procedure 33.1, because he did not argue to the trial court that the evidence should be admitted pursuant to an alleged due process or *Arizona v. Youngblood* violation.[3] Based on the record before us, we conclude that Appellant forfeited the issue because he did not present the constitutional complaint to the trial court that he now raises on appeal.

### A. Trial proceedings

During voir dire, trial counsel informed the court that he subpoenaed the Army quartermaster who discovered journals in McGuire's barracks, and intended to introduce evidence of the journals' contents under a hearsay exception that "show[ed McGuire's] state of mind." Trial counsel later contended that the quartermaster authored a written statement claiming the McGuire journals "talked about killing certain ethnicities, groups, races, religious groups, homosexual, [sic]

---

[3] Appellant did not file a reply brief to respond to the State's argument that he forfeited the issue.

people that are physically and mentally impaired . . ..” The journal writings purportedly contained McGuire's statement that "I want to stab him in the eye. Stab, stab, stab. Watch him bleed out and scream. And stab, stab, stab him in the throat."[4] Counsel wanted to "warn" the court of his argument so that the court could review the hearsay exception.

Before trial commenced, counsel argued again orally and in a trial brief that evidence concerning the journals was admissible under the hearsay exceptions of Texas Rules of Evidence 803(3), (24) and (804)(a)(4), to show "a weird mindset on the part of the deceased[.]"[5] Counsel argued that the quartermaster would testify that he told law enforcement what was written in the journals and the police declined to take the evidence, and told the quartermaster to get rid of it. Counsel acknowledged that law enforcement would contest this testimony, and police did not agree that they told the quartermaster "anything like that." The trial court ordered trial counsel to obtain permission before mentioning the journal's contents.

Outside the presence of the jury during the State's case-in-chief, the trial court asked counsel to delineate the basis for the journal's admissibility. Counsel responded, "I am going totally under subsection--or Title 8 on hearsay," because "hearsay relating to the mental state of a witness is admissible[.]" Counsel "cited three sections of Title 8, subsection 3, subsection 4, and subsection 24," all of which "permit [the evidence] as exceptions to the hearsay rule." McGuire's "mental problems [] set out in the statement of the quartermaster" demonstrated that Appellant triggered McGuire and McGuire threatened to shoot.

---

[4] The Army quartermaster's written statement concerning the journals is not included in the record on appeal.

[5] Appellant filed an "admissibility memorandum" that argued the statements in the journal were admissible pursuant to Texas Rules of Evidence 803(3), (24), and 804(a)(4), and *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex.Crim.App. 1999), which counsel cited for discussing the admissibility of declarations against interest pursuant to Texas Rule of Evidence 803(24).

The trial court concluded the journal writings were not admissible as hearsay exceptions because no evidence indicated McGuire wrote the journal entries, when the entries were written, or what was specifically written. Even if Appellant could establish these predicates, the writings presented Texas Rule of Evidence 403 prejudice and Rule 404 character problems, because evidence is not admissible to show a victim was a "bad person in order to try to justify that they needed killing."[6] Moreover, the journals were not connected to the murder, as nothing established that Appellant knew of the journals and perceived a threat from them.

The trial court asked counsel "how else can you get [the evidence] in?" Appellant replied that the evidence was admissible pursuant to *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex.Crim.App. 1999), to prove that McGuire's "mental problem" made him more likely to do something. The trial court ruled that evidence was excluded at that point in trial. Counsel then asked the court if it was "relevant" that law enforcement told the military to destroy the journals so that the evidence could not be before the court. The court responded that counsel represented that the Army destroyed the journals, not law enforcement.

## B. The Proffer

The next day, trial counsel proffered United States Army Second Lieutenant Dominik Mariutto's testimony concerning the journals. Lieutenant Dominik Mariutto testified as we note above about discovering the three journals while inventorying McGuire's possessions, and his recollection of the journal's contents. Lieutenant Mariutto stated that he spoke to El Paso Police Department Detective Ochoa about the journals, who came to investigate, but was not interested

---

[6] Texas Rule of Evidence 403 provides that a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury, among other reasons. TEX.R.EVID. 403. Pursuant to Texas Rule of Evidence 404(a), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." TEX.R.EVID. 404(a)(1).

after he looked through the writings for several minutes. Lieutenant Mariutto later destroyed the journals. Lieutenant Mariutto testified that he told Detective Ochoa that the journals would be destroyed if law enforcement did not take them.

Following the proffer, the trial court again denied counsel's request to present the testimony.

### C. Constitutional Claims Must Be Preserved

The Court of Criminal Appeals has held that an accused must clearly articulate to the trial court the constitutional basis supporting the admission of excluded evidence to preserve a constitutional claim for appeal. *Golliday v. State*, 560 S.W.3d 664, 669 (Tex.Crim.App. 2018); *Reyna v. State*, 168 S.W.3d 173, 177 (Tex.Crim.App. 2005). In the direct appeal of *Golliday v. State*, the defendant argued that the trial court's rulings that limited his cross-examination of witnesses violated his due process and confrontation rights, and cumulative error prevented him from presenting his defense. *See Golliday*, 560 S.W.3d at 667. But trial counsel did not cite to any constitutional provisions when he argued for admitting the evidence to the trial court, and only asserted hearsay and relevance grounds during his offer of proof. *See id.* at 670. The Court of Criminal Appeals reversed the lower court's finding that the trial court violated the defendant's rights, noting that "in order to preserve an argument that the exclusion of defense evidence violates constitutional principles, a defendant must state the grounds for the ruling that he seeks with sufficient specificity to make the court aware of these grounds." *Id.* at 668-671, *citing Reyna*, 168 S.W.3d at 177 (instructing that it is not enough for an appellant to tell a trial court evidence is admissible; he must tell the trial court why the evidence is admissible).

The *Golliday* court agreed that although hyper-technical words are not required to preserve error, the complaining party must still "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the

judge is in a proper position to do something about it." *Golliday*, 560 S.W.3d at 670, *quoting Clark v. State*, 365 S.W.3d 333, 339 (Tex.Crim.App. 2012) (instructing that the complaint on appeal must comport with the objection made at trial). Parties are not permitted to "bootstrap a constitutional issue from the most innocuous trial objection," and the trial court must be afforded the chance to rule on the "specific constitutional basis for admission because it can have such heavy implications on appeal." *Golliday*, 560 S.W.3d at 670, *quoting Clark*, 365 S.W.3d at 340; *see* TEX.R.APP.P. 44.2(a), (b). The Court held that general arguments about hearsay, that proffered evidence is relevant, or that the jury "needed to 'get the whole picture of the situation,'" do not put the trial court on notice that an accused is raising a constitutional argument. *Golliday*, 560 S.W.3d at 670

In *Reyna v. State*, which the Court of Criminal Appeals recognized as "factually similar and legally indistinguishable" from *Golliday*, the court reversed a grant of relief and concluded that the defendant did not preserve his claim that the federal constitution demanded the admission of evidence. *Golliday*, 560 S.W.3d at 669, *citing Reyna*, 168 S.W.3d at 179-180. The defendant in *Reyna* argued to the trial court that evidence of a victim's false allegations of sexual assault should be admitted for "credibility," which the Court of Criminal Appeals determined could reference either the Texas Rules of Evidence or the Confrontation Clause. *See Reyna*, 168 S.W.3d at 174, 179. The court explained that Texas Rule of Appellate Procedure 33.1 encompasses the concept of party responsibility, which requires the defendant to clearly convey his particular complaint to the trial court, including the precise and proper application of the law.[7] *See id.* at

---

[7] Texas Rule of Appellate Procedure 33.1 provides in pertinent part that

As a prerequisite to presenting a complaint for appellate review, the record must show that:

(1) the complaint was made to the trial court by a timely request, objection, or motion that:

177, *citing Martinez v. State*, 91 S.W.3d 331, 335-366 (Tex.Crim.App. 2002)[8]; TEX.R.APP.P. 33.1.

Because Reyna did not clearly articulate that the Confrontation Clause demanded admission of the

evidence, the trial court did not have the opportunity to rule upon the constitutional rationale. *See*

*Reyna*, 168 S.W.3d at 177.

### D. The Trial Court was not Presented with this Claim

We cannot reverse a conviction on constitutional grounds when Appellant made only an

evidentiary argument to the trial court. *See Golliday*, 560 S.W.3d at 669; *Reyna*, 168 S.W.3d at

174. Prior to trial, counsel informed the trial court and the State orally and in a written motion that

he planned to introduce testimony regarding the journals under a hearsay exception, to show

McGuire's state of mind. When the trial court later asked why the testimony was admissible,

counsel replied that he was going "totally under" . . . "Title 8 on hearsay." Counsel did not mention

due process or that a *Youngblood* violation deprived Appellant of his right to a fair trial after the

---

> (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and
> . . .
> (2) the trial court:
>
> (A) ruled on the request, objection, or motion, either expressly or implicitly; or
>
> (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.

TEX.R.APP.P. 33.1(a)(1)(A), (2).

[8] The Court of Criminal Appeals explained:

> We have previously recognized two general policies for requiring specific objections. "First, a specific objection is required to inform the trial judge of the basis of the objection an afford him an opportunity to rule on it. Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony." Stated more broadly, objections promote the prevention and correction of errors. When valid objections are timely made and sustained, the parties may have a lawful trial. They, and the judicial system are not burdened by appeal and retrial. When a party is excused from the requirement of objecting, the results are the opposite.

*Martinez*, 91 S.W.3d at 336, *quoting Saldano v. State*, 70 S.W.3d 873, 887 (Tex.Crim.App. 2002) (en banc) (footnote omitted).

trial court requested an alternative method of getting the evidence admitted. *See Clark*, 365 S.W.3d at 340 (concluding that the defendant forfeited his constitutional claim after the trial court twice requested a basis for the objection and the defendant did not mention due process). After Lieutenant Mariutto's proffer and Appellant's testimony, counsel continued to argue that evidence concerning the journals was admissible as a hearsay exception concerning McGuire's mental state. *See Golliday*, 560 S.W.3d at 669 (instructing that the appellant is responsible for preserving error by specifically articulating the legal basis for his proffer at trial).

The State was not alerted to the need to respond to a constitutional argument, and Appellant did not "properly put the trial judge on notice that he was making a [constitutional] argument in support of admitting the excluded evidence." *Golliday*, 560 S.W.3d at 670. The trial court was thus not presented with the opportunity to rule on a due process or *Arizona v. Youngblood* basis for admission of the testimony. *See Clark*, 365 S.W.3d at 340 (indicating that the trial court should know when it is being asked to make a constitutional ruling because constitutional error is subject to a much stricter harm analysis on appeal). Appellant also did not meet the error-preservation requirement of Texas Rule of Appellate Procedure 33.1, because he did not raise in the trial court the same complaint he now makes on appeal. *See Reyna*, 168 S.W.3d at 177.

Because the claim is not preserved for review, we overrule the issue.

## III. PRETRIAL PROCEEDING WITHOUT COUNSEL

In his final issue, Appellant argues that he suffered a violation of his constitutional right to the assistance of counsel because the trial court conducted a pretrial proceeding without his attorney present. The State responds that Appellant's Sixth Amendment rights were not violated because the proceeding was not a critical stage of the prosecution. We agree.

### A. Pretrial Proceedings

The trial court set Appellant's case for jury trial on October 19, 2018. Trial counsel thereafter filed a motion to recuse the trial judge, which was denied on October 16, 2018. Two hours after the order denying recusal was filed, the trial court set the case for a "final hearing" on October 18, 2018, the day before jury trial was set to commence. Trial counsel received notice of the final hearing.

On October 17, 2018, trial counsel filed a motion to reconsider the denial of the motion to recuse, and "notice to court," stating he could not attend the October 18th final hearing because he was scheduled to appear in court in another county. The day of the final hearing, trial counsel filed an "announcement of not ready for trial" that requested the trial court waive counsel's presence at the day's hearing and "take whatever appropriate action the [c]ourt feels would be lawful."

Appellant was present at the time of the final hearing, but his counsel was not. The trial court began proceedings on October 18th by announcing that, several weeks earlier, Appellant's trial counsel filed a motion to recuse, which prohibited the court from proceeding with any motions hearings until the recusal issue was resolved. The presiding administrative judge for this region denied that motion on October 16th, two days before the final hearing. On the day of the final hearing, the trial court received counsel's "announcement of not ready for trial." The court stated it would "not at this time and has never waived . . . the presence of a lawyer at a hearing."

The trial court stated that it intended "to establish a record in the event of defense counsel's continued refusal to show up for a court hearing." Because trial counsel had recently filed two sequential motions for reconsideration--a reconsideration of the denial of the motion for recusal and reconsideration of a denial of a writ of habeas corpus filed with the Court of Criminal Appeals--the trial court treated the motion to reconsider the denial of the recusal as a stay from any further proceedings. The presiding judge for the administrative judicial region would resolve all motions before him by the next morning's docket call.

15

The trial court then engaged in the following discourse:

> Trial Court: Mr. Montoya [the prosecutor], thank you for being here. You were given notice of this hearing?
>
> The State: Yes, sir.
>
> Trial Court: The record should reflect that the court coordinator has also indicated that [trial counsel] was given notice as is evidence by this announcement of not ready for trial. We will see everybody tomorrow at 8:00 o'clock for the jury selection process.

Trial counsel adjourned the proceedings.

Later that same day, the trial court went back on the record, stating that, because it received a fax from the presiding administrative judge of the Sixth Judicial Region denying trial counsel's motion to reconsider the denial of the motion to recuse, all pretrial motions would be heard the next day, followed by voir dire.[9]

## B. Controlling Law

Once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present during all "critical" stages of his prosecution. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *see* U.S. CONST. AMENDS. VI, XIV. "Not every event following the inception of adversary judicial proceedings constitutes a 'critical stage' so as to invoke the right to counsel under the Sixth Amendment." *Gilley v. State*, 418 S.W.3d 114, 120 (Tex.Crim.App. 2014), *quoting Green v. State*, 872 S.W.2d 717, 720 (Tex.Crim.App. 1994) (en banc). A "critical stage" is one that holds "significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 696 (2002); *see Missouri v. Frye*, 566 U.S. 134, 140 (2012) ("[c]ritical stages include arraignments, postindictment interrogations, postindictment lineups, and the entry of a guilty plea"). To assess whether a pre-trial proceeding is a "critical stage," the supreme court calls

---

[9] In fact, the trial did not actually commence until March 29, 2019, and the case was heard by the Hon. Stephen Ables, Presiding Judge of the Sixth Administrative Region.

for an examination of the event to determine whether the defendant "required aid in coping with legal problems or assistance in meeting his adversary." *Gilley*, 418 S.W.3d at 120, *quoting United States v. Ash*, 413 U.S. 300, 313 (1973) (holding that the Sixth Amendment does not grant the right to counsel at a postindictment photographic identification conducted by the government). In essence, a reviewing court must scrutinize the pretrial event to ascertain whether counsel's presence was necessary "to assure fairness and the effective assistance of counsel at trial." *Gilley*, 418 S.W.3d at 120, *quoting Green*, 872 S.W.2d at 720.

In *United States v. Cronic*, the Court offered guidance concerning the scope of the term by enumerating situations where it found constitutional error, without a showing of prejudice, when counsel was either totally absent or prevented from assisting a defendant during a critical stage of the proceedings. *See United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984). For instance, a trial court's order preventing a defendant from consulting with his attorney during an overnight trial recess impinged upon his right to counsel. *See id.*, *citing Geders v. United States*, 425 U.S. 80, 91 (1976). A trial court violated a defendant's Sixth Amendment rights by denying counsel the opportunity for closing summation. *See Cronic*, 466 U.S. at 659 n.25, *citing Herring v. New York*, 422 U.S. 853, 859 (1975). A statute requiring a defendant to testify first or not at all restricted counsel from planning the case such that the defendant was constitutionally deprived of the assistance of counsel. *See Cronic*, 466 U.S. at 659 n.25, *citing Brooks v. Tennessee*, 406 U.S. 605, 612-13 (1972). The Court also held that constitutional prejudice was presumed when an Alabama capital defendant was arraigned without counsel, because certain defenses and motions must be presented at that time. *See Cronic*, 466 U.S. at 659 n.25, *citing Hamilton v. State of Alabama*, 368 U.S. 52, 53-55 (1961).

Conversely, in *Green v. State*, the Texas Court of Criminal Appeals concluded that nothing occurred during a defendant's preliminary initial appearance that amounted to a critical stage

invoking the right to counsel. *See* 872 S.W.2d at 722. During the proceeding, the magistrate made a probable cause determination, and advised the defendant of the charges against him and his *Miranda* rights. *Id*. at 718. The court could "hardly imagine a reason" that counsel would need to be present for the dispensation of *Miranda* rights, and the defendant did not enter a plea. *Id.* at 721. The fact that counsel could have contested bail at the proceeding did not convert it into a critical stage; the appearance was not *per se* a requirement of state law and counsel could attack excessive bail through a writ of habeas corpus. *Id.* at 722. The court could thus not find that the defendant was required to cope with any legal problem or assist in meeting a prosecutorial adversary. *See id.*

### C. The Proceeding was not a Critical Stage

The October 18th events were not a critical stage invoking the right to counsel because the trial court's administrative announcement that the proceedings were stayed did not hold "significant consequences" for Appellant. *See Bell*, 535 U.S. at 696. Although the trial court had arranged for several of Appellant's motions to be heard that day, including motions to dismiss the indictment and for reduction of bond, the motions were not addressed because counsel did not appear. *See Green*, 872 S.W.2d at 720-21 (concluding that defendant's preliminary initial appearance was not a critical stage because an examining trial and bail hearing did not occur). To protect Appellant's right to receive the "guiding hand of counsel," the trial court stayed all further proceedings. *Ash*, 413 U.S. at 300, *citing Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963). The stay ensured that Appellant's trial was fundamentally fair, in that motions were not addressed in the absence of counsel or while the motion to reconsider the denial of the motion to recuse the trial judge was pending. *See Cronic*, 466 U.S. at 658 (informing that the right to counsel is not recognized "for its own sake," but "because of the effect it has on the ability of the accused to receive a fair trial"). Appellant does not claim that he was deprived of the right to have his pretrial

motions heard, and this hearing was not a *per se* requirement of state law. *See Green*, 872 S.W.2d at 722. Because Appellant's constitutional rights were not in jeopardy, and the fairness of his trial was guarded, Appellant did not "require[] aid in coping with legal problems[.]" *Gilley*, 418 S.W.3d at 120, *citing Ash*, 413 U.S. 313.

Neither the trial court nor the State addressed Appellant during the proceedings. Neither Appellant nor any witnesses provided evidence or testimony. No matters of evidence or discovery were discussed. *See Ash*, 413 U.S. at 309 (relaying that a core purpose of the counsel guarantee is to assist an accused when he was confronted with the intricacies of law and advocacy of a prosecutor). The content and merits of Appellant's motions were not discussed, other than the trial court's announcement permitting the defense additional time to prepare for the hearing. *Cf. McDonald v. State*, 597 S.W.2d 365, 368 (Tex.Crim.App. [Panel Op.] 1980) (concluding that the trial court's ruling on a motion for new trial was not a critical stage requiring the presence of Appellant and his attorney, because there was nothing the parties were required or permitted to do). Providing Appellant and trial counsel with an additional day to communicate and prepare their motions and defense did not violate his Sixth Amendment rights. *See Geders*, 425 U.S. at 91 (finding Sixth Amendment violation when trial court's order prevented defendant from communicating with counsel).

The trial court called the case to make a record that counsel did not appear for the final motions hearing, to protect Appellant's constitutional rights in the event counsel did not show for future court dates, and to announce that proceedings were stayed. The trial judge stated he would not and never had "waived the presence of a lawyer at a hearing," indicating no intention of depriving Appellant of his Sixth Amendment rights. Because Appellant was not called to meet his adversary during the proceeding, his Sixth Amendment rights were not violated. *See Gilley*, 418 S.W.3d at 121, *citing Ash*, 413 U.S. at 313. We thus overrule the issue.

## IV. CONCLUSION

Having overruled all of Appellant's issues on appeal, we affirm the trial court's judgment adjudicating guilt.

JEFF ALLEY, Justice

April 30, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)